UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND

SIGNAL PERFECTION, LTD        :
                                :
      Plaintiff/Counter Defendant     :
                                :
            v.                :     Case No. 10-2331 WGC
                                :
MCPHEE ELECTRIC, LTD.          :
                                :
      Defendant/Counter Plaintiff    :

<u>MEMORANDUM OPINION</u>

Plaintiff, Signal Perfection, Ltd. ("SPL") filed a four count complaint against McPhee Electric, Ltd. ("McPhee") arising out of SPL's contract to perform the audio-visual work during the construction of the Gaylord National Resort and Convention Center in Oxon Hill, Maryland. (ECF No. 1).  The four counts are breach of contract, violation of the Maryland Prompt Payment Act (Md. Code Ann. Real Prop. § 9-301 *et. seq.*), unjust enrichment, and quantum meruit. McPhee filed a one count counterclaim against SPL alleging breach of contract. (ECF No. 6).

Following summary judgment proceedings, the parties consented to have a magistrate judge hear and decide the case (ECF No. 55) and the matter was referred to the undersigned for all further proceedings and the entry of judgment on June 21, 2012. (ECF No. 56).  Trial was held on January 14, 15, 16, 17 and 18, 2013.  At the conclusion of all the evidence, the court entered judgment in favor of McPhee and against SPL as to counts III (unjust enrichment) and IV (quantum meruit). (ECF No. 114).  The matter was taken under advisement and the parties filed proposed findings of fact on April 25, 2013 (ECF Nos. 122 and 123).   The court has reviewed the pleadings, five days of trial transcripts, admitted exhibits, and the proposed findings of fact and now rules.

## FINDINGS OF FACT

1) SPL is a Maryland limited liability company with its principal place of business in Columbia, Maryland.  It is a "parts and smarts" company performing all the design and engineering work of audio-visual systems and the fabrication of racks, while subcontracting to others the wiring, installation, and final terminations for the audio-visual systems on a given project.  SPL is a sophisticated international audio-visual contractor focusing on large scale, high-end audio-visual projects.  It has completed audio-visual work at various sports stadiums including Camden Yards and M&T Bank Stadium in Baltimore, FedEx Field in Landover, Soldier Field in Chicago, Lambreau Field in Green Bay, and Yankee Stadium in New York. SPL has performed major audio-visual work in hotels and casinos in Las Vegas including the Mandalay Bay Hotel and Convention Center, the Bellagio, the Venetian, the Paris, and the Aladdin.

2) McPhee is a Connecticut corporation with its principal place of business in Farmington, Connecticut.  It is a prime electrical construction company licensed to perform services in Connecticut, Massachusetts, Maryland, New Hampshire, New Jersey, New York, Rhode Island, Vermont, and Virginia.

3) MTR Electrical Construction, LLC ("MTR") is a Maryland limited liability company and a tri-venture whose members are McPhee, Truland Systems Corporation ("Truland"), and J.E. Richards Electric, Inc. ("J.E. Richards").

4) Gaylord National, LLC ("Gaylord") is the owner and developer of the Gaylord National Resort and Convention Center in Oxon Hill, Maryland.  As originally planned, the Project consisted of the construction of a 1,500 guest room hotel, significant structural parking, and 470,000 square foot convention center.   In 2006, Gaylord expanded the hotel with an

additional 500 guest rooms.

5) Perini/Tompkins Joint Venture ("PTJV") is a joint venture of the Perini Corporation of Framingham, Massachusetts and Tompkins Builders, Inc. of Washington, D.C.   Both Perini Corporation and Tompkins Builders, a wholly-owned subsidiary of Turner Construction Company, are leading construction services companies in both the private and public sectors.

6) On or about May 9, 2005, Gaylord contracted with PTJV to serve as the Project's prime contractor and to provide all construction management services for and to coordinate construction of the Project.

7) On or about January 18, 2006, PTJV subcontracted with MTR on a "Cost Plus Fee" basis to perform the electrical, telecommunications, security and audio-visual work on the Project (the "MTR Subcontract").  The MTR Subcontract contained no completion date for the Project or MTR's work under the MTR Subcontract.  At the time of the MTR Subcontract, the target completion date for the Convention Center was November 2007 and the target completion date for the Hotel was December 2007.  As part of McPhee's responsibilities, McPhee agreed to manage all MTR work and to enter into and administer all of MTR's subcontracts related to the Project.  McPhee did not have a contract with either Gaylord or PTJV, and received payments for its work on the Project through MTR.

8) On August 17, 2006, Gaylord, PTJV and MTR held a pre-bid meeting for potential audio-visual bidders to describe the audio-visual scope of the work and the constraints (*e.g.*, out-of-sequence work) so bidders could prepare comprehensive bids.  George Douglas, SPL's Senior Vice President, attended the pre-bid meeting, as did representatives from Nelson White Systems, Inc., a local minority-owned subcontractor.

9) Also present at the pre-bid meeting on August 17, 2006 were Chess McKinney from

Gaylord, Dick Schuler from PTJV, and Ron Stawecki from MTR.

10) During the pre-bid meeting, PTJV reviewed the Project and the scope of the audio-visual work.  The fact that Gaylord had recently approved the addition of approximately 500 hotel rooms to the Project (Phase II) and its impact on the anticipated hotel completion date was discussed.

11) By August 2006, PTJV had already poured the foundations for the Phase II addition and was telling bidders and subcontractors to anticipate a revised target completion date for the end of January 2008 for the Convention Center and March 2008 for the Hotel.

12) At the pre-bid meeting, SPL was advised that, like all work at the Project, the audio-visual ("A/V") subcontractor should expect significant "out-of-sequence" work, meaning that the A/V subcontractor should not expect to work in its preferred order and manner.  SPL was advised to account for the cost of the out-of-sequence work in its bid.

13) On September 19, 2006, SPL submitted its initial proposal for the audio-visual bid package to PTJV.  The total bid price was $6,786,586 and included 1,000 hours of overtime for out-of-sequence work.

14) Following submission of its bid, SPL was selected by Gaylord as the audio-visual subcontractor to McPhee on the Project.

15) Following its selection, SPL attended a meeting at which the parties discussed the addition of Phase II to the Project, which added more meeting rooms to SPL's scope, as well as some other potential scope changes and value-engineering alternates.   On October 18, 2006, SPL sent an email to MTR with revisions to SPL's bid price.  These revisions included an additional 2,000 man hours in overtime work which were subsequently removed.  The final bid price, not including the 2,000 overtime hours (estimated at $173,000) was $7,240,293.

16) In mid-December 2006, McPhee, on behalf of MTR, entered into a lump sum subcontract for all the A/V work for the Project (the "Subcontract").  SPL executed the Subcontract on December 18, 2006 and McPhee executed the Subcontract on December 19, 2006.  The subcontract price was $7,240,293. The Subcontract incorporated SPL's revised bid price and equipment list as SPL's Scope of Work for the Project.

17) The Subcontract contains a provision that states the Subcontract supersedes all prior negotiations.  Article 14.9 provides:

> 14.9 ENTIRE AGREEMENT
>
> This Subcontract is solely for the benefit of the signatories hereto and represents the entire and integrated Agreement between the parties hereto and supersedes all prior negotiations, representations, or agreements, either written or verbal.

18) The Subcontract does not contain a date certain to start the work, to finish the work, nor is there a guaranteed duration to perform the work.  Article 3.1 provides:

> 3.1 TIME IS OF THE ESSENCE
>
> Time is of the essence of this Subcontract.  Whenever this Subcontract refers to days, the reference shall be calendar days. The Subcontractor shall perform the Work in strict accordance with the schedule published by the Construction Manager and/or the Contractor for the Project (the "Project Schedule").  The Subcontractor shall provide the Contractor with any requested scheduling information for the Work, and attend all scheduling meetings as requested by the Contractor.

19) The scope of work of SPL is set forth in Article 2.1 which provides:

> 2.1 SUBCONTRACTOR'S WORK
>
> The Subcontractor shall provide and pay for all labor, materials, equipment, supplies, facilities, sales tax, supervision and administration necessary for the proper and complete performance and acceptance of the work as described in Schedule A "Scope of Work", attached hereto and made a part hereof, all of which is referred to as the "Work" or the "Subcontractor's Work".

Schedule A is a 27 page listing of specific equipment which SPL was required to install.  The total material cost was $3,750,761 and the total labor cost was $2,879,114.  Shipping and handling, equipment rental, and payment and performance bonds brought the total subcontract price to $7,240,293.

20) The Subcontract also provides for changes in the schedule of work as well as work interruptions.  Articles 3.2 and 3.3 provide:

> 3.2 SCHEDULE CHANGES
>
> The Subcontractor recognizes that changes may be made in the Schedule of Work and agrees to comply with such changes. Subcontractor recognizes that scheduling of the Work is the exclusive right of the Contractor and Subcontractor agrees to adhere to schedule changes without any additional compensation.
>
> 3.3 COMMENCEMENT
>
> The Subcontractor shall commence the Work as instructed by the Contractor.  If the Work is interrupted for any reason, the Subcontractor shall resume such Work within three days from the Contractor's notice to do so.

21) The Subcontract specifically provides that SPL may be required to increase its workforce and accelerate its performance without additional compensation.  Article 8.9 provides in pertinent part:

> 8.9 PROGRESS AND PERFORMANCE
>
> The Subcontractor shall promptly increase its work force, accelerate its performance, work overtime, work Saturdays, Sundays and holidays, all without additional compensation, if, in the opinion of the Contractor, such Work is necessary to maintain progress in accord with the Schedule of Work.  The Subcontractor shall conform to the Contractor's hours of work.  No premium time will be acknowledged or paid unless pursuant to a written agreement to do so by the Contractor.

22) Additional provisions of the Subcontract cover changes and claims.  Articles 6.1, 6.2.1 and 6.2.2 provide:

6.1 CHANGES

The Subcontractor shall not be entitled to, nor shall it receive, any increase in the Subcontract price or increase in the time for performance of the Work except upon the written Change Order from the Contractor.

6.2.1 CHANGE ORDER

The Contractor may order changes, additions, or deletions in the Work by written Change Order.  Any change or adjustment in the Contract price by virtue of such Change Order shall be specifically stated in said Change Order.  Prior to the issuance of any Change Order, the Subcontractor if requested by the Contractor shall furnish within seven days or sooner if required by the Contract Documents, a detailed breakdown showing the difference in value of work, labor, services, and materials altered, added, omitted or changed by the proposed Change Order.  If an agreement as to monetary allowance or other terms in the Change Order cannot be reached, the Contractor[] may direct in writing the Subcontractor to perform the Work with the final adjustment reserved until completion of the Subcontract and General Contract.  The failure of the Subcontractor to immediately commence performance of any Change Order, when so directed in writing by the Contractor, whether or not all terms have been agreed upon, may be deemed a material breach and the Subcontractor held in default of this Subcontract.  Any extension of time needed as a result of a proposed Change Order shall be requested by the Subcontractor in writing prior to the issuance of the Change Order and shall be incorporated therein to the extent required by the change.

6.2.2 CHANGE ORDER

Adjustment in the Contract Price or Contract time, if any, resulting from Owner initiated Change Orders shall be determined pursuant to the Contract Documents.  Notwithstanding any other provision of this Agreement to the contrary, in no event shall Subcontractor be entitled to price or time adjustments for Owner initiated change orders in an amount greater than Contractor receives from the Owner.

23) The issue of delays in the Subcontractor's Work is covered in the Subcontract.  The Subcontract contains a "no damages for delays" clause that limits SPL's recovery for an excusable delay to an extension of time.  Article 6.6 provides:

6.6 DELAY

If the progress of the Subcontractor's Work is substantially delayed without the fault or responsibility of the Subcontractor, then the time for the Subcontractor's Work shall be extended by Change Order only to the extent such extensions are obtained by Contractor from the Owner under the Contract Documents.

The Contractor shall not be liable to the Subcontractor for any damages or additional compensation as a consequence of delays, hindrances, interferences, or other similar events, caused by any act or omission of the Contractor, it being understood and agreed by the Subcontractor that the Subcontractor's sole and exclusive remedy against the Contractor for delay, hindrance, interference or other similar event, shall be an extension in the time for performance of the Subcontractor's Work.

24) The time for the presentation of claims by the Subcontractor against the Contractor is specified in the Subcontract.  Articles 6.5.1 and 6.5.2 provide:

6.5.1 CLAIMS

The Subcontractor shall give the Contractor written notice of all claims which do not affect or will not become a part of a claim by the Contractor against the Owner under the terms of the Contract Documents within three days of the beginning of the event for which claim is made; otherwise, such claims shall be deemed waived.  During the pendency of the dispute the Subcontractor shall diligently proceed with the Work.

This Article was modified by Attachment K of the Subcontract to increase the time for providing notice from three days to five days from the commencement of any happening that gives rise to a claim.

6.5.2 CLAIMS

Any claim which will effect or become part of a claim which the Contractor has against the Owner under the Contract Documents shall be made by the Subcontractor within the specified time and in the specified manner provided in the Contract Documents in sufficient time to permit the Contractor to satisfy the requirements of the Contract Documents.  Such claims must be received by the Contractor not less than three working days proceeding the time by

which the Contractor's claims must be made to the Owner.  Failure
of the Subcontractor to make such timely claims shall bind the
Subcontractor to the same consequences as those to which the
Contractor is bound.

This Article was modified by Attachment K of the Subcontract to increase the time for providing

notice from three days to five days.

25) The Subcontract contains a "pay-if-paid" clause which provides in Article 5.1.2 in

pertinent part:

5.1.2  PROGRESS PAYMENTS AND FINAL PAYMENT

The Contractor shall be under no obligation to make any progress,
retainage, or other payment to the Subcontractor except to the
extent that the Contractor has received funds from the Owner for
the Work invoiced by the Subcontractor.  That is to say, the
Subcontractor shall not be entitled to payment if for any reason,
including the Owner's financial situation or lack of available
funds, the Owner fails to pay the Contractor in accordance with the
Contract Documents.  Payment from the Owner is a condition
precedent to any obligation of the Contractor to pay the
Subcontractor.

26) The Subcontract provides in Article 2.4:

2.4 DOCUMENT REVIEW

The Subcontractor hereby acknowledges that it has carefully
reviewed and examined this Subcontract with all other documents
directly or indirectly relating to this Subcontract, including the
Contract Documents, and acknowledges that it understands these
documents and will not assert any claim against the Contractor
based upon any alleged ambiguity, conflict or discrepancy.  In the
event of a conflict among the Contract Documents or this
Subcontract Agreement, the Subcontractor shall be required to
perform the higher standard or greater requirement.

27) While the Subcontract provides that time is of the essence, it does not delineate a

specific time period or date for either substantial completion or final completion of all or any

part of the Subcontract work.  There is no schedule attached to or incorporated in the

Subcontract.  SPL did not have a Project Schedule at the time of execution of the Subcontract

and did not receive a formal Project Schedule from PTJV until February 2007.  The Subcontract

also provides that SPL is not entitled to delay damages.

28) SPL subcontracted portions of its scope of work to Tech, Inc. ("Tech") and Nelson

White Systems, Inc. ("NWS").

29) Tech was hired to pull all of the cable for the audio-visual systems.  Tech was

awarded a lump sum contract in the amount of $538,481.  Tech is a subsidiary of Truland, one of

the tri-venture partners in MTR.  Tech also worked on the Project as the data and

communications installer for McPhee.

30) To meet the twenty percent (20%) minority participation requirement for the Project,

SPL hired NWS, a women-owned audio-visual company based in Towson, Maryland.  NWS was

awarded a lump sum contract in the amount of $1,490,714.51.  NWS was responsible for

supplying both equipment (including all of the speakers, back cans, liquid crystal display

("LCD") displays, projectors, and screens) as well as labor to terminate the cables for all field

devices.

31) Neither of SPL's subcontracts with NWS or Tech contained specified completion

dates.

32) Guaranteed Maximum Price ("GMP") Amendment No. 12, which established a

revised substantial completion date of March 23, 2008, was executed between Gaylord and PTJV

on March 26, 2007.

33) Over the course of SPL's performance under the McPhee/SPL Subcontract, SPL and

McPhee executed four (4) written Change Orders.

34) Change Order No. 1 included the Phase II scope of work as well as various changes,

including both additions and deletions, in equipment.  The net value of Change Order No. 1 was

$747,393.13.  Change Order No. 1 was accepted by McPhee on June 20, 2007 and by SPL on

June 22, 2007.  Change Order No. 1 specifically states that the contract time will not be changed.

The change order provided $52,000 in additional funds for SPL project management, field

engineers and SPL supervisory staff.  Change Order No. 1 also contained $262,306 for NWS

including $153,775 in additional labor.

 35) Change Order No. 2 included (a) the addition of an audio conferencing system in one

of the boardrooms, (b) the addition of speakers in the steakhouse, © the addition of security

monitors, and (d) the addition of LCD displays in the sports bar.  The value of Change Order No.

2 was $162,122.77.  Change Order No. 2 was accepted by McPhee on December 10, 2007 and

by SPL on December 4, 2007.  Change Order No. 2 specifically states that the contract time will

not be changed.

 36) Change Order No. 3 was for the Pose Nightclub and included the addition of

"loudspeakers, displays, rack equipment, taxes, freight, engineering, management, programming,

warranty, etc."  The value of Change Order No. 3 was $617,588.48.  Change Order No. 3 was

accepted by McPhee on January 24, 2008 and by SPL on January 17, 2008.  Change Order No. 3

specifically states that the contract time will not be changed.

 37) Change Order No. 4 was to compensate SPL for the provisions of materials related to

changes to the sport bar VIP areas, the hotel boardroom, retail areas, fountain show, local

catering room, and additions to the Pose Nightclub.  The value of Change Order No. 4 was

$240,919.  Change Order No. 4 was accepted by McPhee on June 5, 2008 and by SPL on May

21, 2008.  Change Order No. 4 specifically states that the contract time will not be changed.

 38) On the front of each of the four change orders the following language appears:

> All work shall be performed in strict accordance with the Contract
> Documents and the terms and conditions of the sub-contract
> agreement.  The subcontractor further agrees that this change order
> adjusts the subcontract amount and time, and fairly reflects all
> overhead, profit, costs, delays, damages and other payments that
> may be claimed due and owing to the subcontractor as of the above
> stated date, and agrees that acceptance represents final settlement
> of the subcontractor's claims against the General Contractor and
> the Owner as a result of this or any prior changes in the work.
> This Change Order is not valid unless signed by the General
> Contractor and Subcontractor.

39) In order to be paid SPL submitted Payment Applications which certified that work

identified in the application was completed in accordance with the Contract Documents.  On the

front of each Payment Application the following language appears:

> The undersigned Contractor certifies that to the best of the
> Contractor's knowledge, information and belief the Work covered
> by this Application for Payment has been completed in accordance
> with the Contract Documents, that all amounts have been paid by
> the Contractor for Work for which previous Certificates of
> Payment were issued and payments received from the Owner, and
> that current payment shown herein is now due.

40) In Payment Application No. 15, covering all work through January 31, 2008, SPL

certified that it was 100% complete with its base Subcontract work.

41) In exchange for receipt of progress payments for work performed at the Project, SPL

would submit a Partial Lien Release, Bond Release and Affidavit.   The document used provides

in part:

> That the undersigned, for and in consideration of the payments
> made of (amount of payment) by McPhee Electric Ltd. to the
> undersigned for labor employed in and/or materials furnished for
> or about the construction project:
>
> PROJECT NAME: Gaylord National
>
> PROJECT NUMBER: 1593-983 or 1593-992
>
> does hereby acknowledge payment in full (except retainage) and

does hereby release and discharge the Owner of the real estate
and/or improvements thereon, McPhee Electric Ltd. and its
Payment and Performance Bond Surety, from all debts, demands,
or claims arising from the project to the date of the requisition for
which payment is made....

The undersigned does hereby certify and warrant, and it is one of
the express conditions upon which payment is made, that all
persons, firms or corporations who have supplied labor, materials,
equipment or services to the undersigned or any subcontractor of
the undersigned for the Project have been paid in full, including all
pension fund and employee benefit contributions, and that none of
such persons, firms or corporations have any claim, demands, or
liens against said premises....

42) The Subcontract contains the following non-waiver clause:

14.7 SEVERABILITY AND WAIVER

The partial or complete invalidity of one or more provisions of this
Subcontract shall not affect the validity or continuing force and
affect of any other provision.  The failure of either party hereto to
insist, in one or more instances, upon the performance of any of
the terms, covenants or conditions of this Subcontract, or to
exercise any right herein, shall not be construed as a waiver or
relinquishment of such terms, covenant, condition or right as
respects further performance.

43) The adjusted contract value, including the four signed change orders referenced

above between SPL and McPhee was $9,010,316.[1]  To date,  McPhee has paid $8,970,748.  SPL

owed McPhee $25,102 as a credit for the Owner Controlled Insurance Program ("OCIP").

44) SPL's damages claims total $959,417 as set forth it its Proposed Findings of Fact and

Conclusions of Law (ECF No. 122, Finding of Fact 235).  The monies that SPL is seeking are

for (a) an outstanding contract balance of $226,752, (b) delay-related damages in the amount of

$268,106, © disruption-related damages in the amount of $226,688 and (d) interest on the

---

[1] The adjusted contract value actually totals $9,008,316.38.  During trial and in their
briefs the parties cite the total adjusted contract value as $9,010,316.

amounts claimed through January 26, 2011 and a 5% markup minus a $6,000 credit in the

amount of $231,891.  These damages are outlined in the report of SPL's expert, D. Leroy

Trimbath, a director of the Pittsburgh consulting firm, The Duggan Rhodes Group.  This entity

provides scheduling and cost analysis services specifically in the construction industry.  Mr.

Trimbath prepared both an initial report and an amended report and testified at trial.

45) Of the $226,752 in the claimed outstanding contract balance, $111,525 represents

half of the remaining retainage which SPL billed for in Payment Application No. 20-2.  The total

amount requested by SPL was $223,051.  SPL acknowledges that it received from McPhee

$111,526 on August 18, 2008 which left a balance of $111,525.  The second component of the

claimed outstanding balance is for $140,329 which was contained in SPL's Payment Application

No. 20-3 and represents change order related labor costs.  SPL submits that McPhee approved

the materials associated with these labor costs in Change Order No. 4 to SPL's Subcontract.  The

third component is a credit in favor of McPhee in the amount of $25,102 representing a

deduction from the Subcontract amount associated with the Project's OCIP.

46) SPL contends that it has incurred delay-related damages totaling $268,106.  SPL

submits that it reasonably anticipated completing its contracted scope of work by December 31,

2007.  As a result of delays to its work on the Project which were beyond its control, SPL was

forced to spend an additional 26 weeks on the Project.  While a substantial completion certificate

for the Project was issued on April 28, 2008, SPL claims that due to issues beyond its control, it

could not complete its work until June 20, 2008.

47) The additional 26 weeks of work resulted in three types of delay-related damages.

The first type concerns extended project management and onsite support in the amount of

$156,462.  This figure does not represent labor costs, but management costs and onsite support

staff for the first six months of 2008.  The amount is derived by computing the six month base

wages of management and support staff employees (Linwood Warrington, L. D. Parker, Tom

Fortwengler and Christopher Drye (inventory control)), adding 29.3% for payroll taxes,

insurance, benefits, as well as a  5% markup, and deducting a small amount recovered through

Change Order No. 3.  The second type regards $11,449 in extended onsite project support costs.

This sum consisted of payments for trailer rental and storage, portable toilets and fence service,

phone service, alarm and monitoring service, and a 5% markup.  The third type involves

$100,195 for extended home office overhead which is limited to the Columbia, Maryland office.

This sum represents SPL provided administrative support resources for the Project including

payroll processing, payment invoices, job cost reporting, purchasing of materials, invoicing of

Payment Applications, safety, legal, and executive overview as well as general business

insurances for the operations of the company.  The Manshul method, which has been adopted by

the New York court system as a means of quantifying administrative costs used to support but

not directly charged to a specific project, was used to calculate the claimed amount.

48) SPL has claimed $226,688 in disruption-related damages, which are damages

associated with the additional manpower, overtime and other additional costs related to changes

to productivity on the Project.  Four components comprise the disruption-related damages.

49) The first component of disruption-related damages is the Nelson White Overtime

Premium in the amount of $8,330 representing money NWS was forced to expend in more

overtime hours than what NWS had placed in its bid.  This amount is inclusive of a 5%

contractual markup.

50) The second component of disruption-related damages is the Nelson White Labor

Inefficiency totaling $149,178.  This damage claim rests upon Mr. Trimbath's findings that

NWS only earned $11 per hour for every man hour spent during the most impacted period of work (end of December 2007 through March 2008 consisting of 6,740 man-hours), whereas NWS was able to earn $70 per hour for every man hour expended during the least impacted period of work (October 2007 to December 2007 consisting of 4,258 man-hours).  Mr. Trimbath concluded that NWS spent 5,423 more hours than anticipated because of project disruption, which at the average hourly labor rate of $26.20, caused NWS to incur additional costs totaling $149,178 which includes a 5% contractual markup.  During trial it was learned that WAV Integrations ("WAV") performed change order work activity during the impacted period which removed approximately 110.5 hours from the loss of productivity calculation which equates to a reduction of approximately $3,000.

51) The third component of disruption-related damages is a Premium Paid for Additional Labor.  Because WAV was brought onsite to specifically assist NWS in the completion of its base contract work and therefore, this expense was not anticipated, Mr. Trimbath concluded that NWS is entitled to the additional premium of $23.80 per hour or $53,865 (inclusive of a 5% contractual markup) for the 2,155 hours that WAV worked on the Project.  If accepted by the court this figure should be reduced by $2,750 as testimony at trial disclosed that approximately 1,100 hours of WAV's time was billed at $47.50 per hour, not $50 per hour.  Mr. Trimbath testified that the amount should be reduced by $3,000.

52) The fourth component is $21,315 for additional compensation which SPL paid its salaried employees for overtime that was spent due to the disruptions on the Project.  Three of the employees (Warrington, Parker, and Fortwengler) were salaried employees and were not paid overtime.  According to SPL's time sheets, the salaried employees worked overtime on the Project, something SPL's managers and engineers would not normally do.  SPL's management

elected to compensate its salaried employees for overtime work by paying bonuses to them thus incurring $21,315 in additional compensation.

53) Mr. Trimbath testified that based upon an annual interest rate of 6%, the interest on SPL's contract balance would be $60,117 and the interest on damages would be $139,791 through January 18, 2013.  Mr. Trimbath also opined that SPL should receive a 5% markup from McPhee on NWS's and Tech's recovered costs, which total $10,590 and $27,393 respectively, and is separate and apart from the 5% markup that NWS would receive from SPL and therefore is not a duplication.

54) In summary, SPL's damages are as follows:

| | | |
|---|---|---|
| Outstanding Contract Balance | | $226,752 |
| One half of remaining arrearage | $111,525 | |
| Payment Application No. 20-3 | $140,329 | |
| Less: Credit OCIP | $-25,102 | |
| Delay-Related Damages | | $268,106 |
| Extended Project Management | $156,462 | |
| Extended Onsite Project Support | $ 11,449 | |
| Extended Home Office | $100,195 | |
| Disruption-Related Damages | | $226,688 |
| NWS Overtime Premium | $   8,330 | |
| Labor Inefficiency Calculation | $149,178 | |
| Premium Paid for Additional Labor | $ 53,865 | |
| SPL Employee Additional Comp. | $ 21,315 | |
| Less: Credits (2) | $  -6,000 | |
| Interest (6% Per Annum) through 01/18/13 | | $199,908 |
| SPL | $ 60,117 | |
| Damages | $139,791 | |
| 5% Contractual MarkUp | | $ 37,983 |
| NWS | $ 10,590 | |

| | |
|---|---|
| Tech | $ 27,393 |
| TOTAL | $959,437 |

The court notes that the above figure of $959,437 is a $20 more than the amount claimed by SPL in its Findings of Fact.

55) McPhee disputes all of SPL's claims based on factual and legal bases.

56) SPL has claimed $226,752 in outstanding contract balances consisting of $111,525, the retainage left in Payment Application No. 20-2, $140,329 for Payment Application No. 20-3 representing change order labor related costs, less a credit of $25,102 due McPhee from the Project's OCIP.

57) McPhee disputes the methodology used by SPL in determining whether there are outstanding contract balances.  McPhee urges the court to look at the total transaction, not individual transactions, to determine if all contract balances have been paid.  Here, the adjusted SPL Subcontract sum, including all four change orders, total $9,010,316.  McPhee paid SPL $8,970,401, leaving a balance due of $39,915.  Three adjustments must be made to the $39,915 balance.  First, McPhee is entitled to a $25,102 SPL OCIP Credit and the Tech Subcontract Balance with SPL of $22,560.  Tech owes SPL $18,371 associated with the OCIP and SPL is entitled to the funds.  After these calculations are made McPhee claims it owes SPL $10,624 as a contract balance, not the $111,525 as claimed by SPL.

58) As to Payment Application No. 20-3 representing change order labor related costs, McPhee acknowledges receipt of the pay application.  However, neither McPhee nor MTR ever received a change order from PTJV for labor related costs associated with SPL's Payment Application No. 20-3.  Neither did either MTR nor McPhee receive payment for the labor related costs associated with SPL's Payment Application No. 20-3.

59) McPhee has numerous disputes with SPL's delay-related damages.  McPhee strongly disputes that SPL could have reasonably anticipated completing its contracted scope of work by December 31, 2007.  Regardless of the impression that SPL may have formed from pre-bid meetings as to the completion dates, the addition of Phase II changed the Project completion dates to January 2008 for the Convention Center and March 2008 for the Hotel.  These dates were widely known and were publicly available through Perini and Gaylord's filings with the Securities and Exchange Commission.  Indeed, SPL's own correspondence anticipated January 20, 2008 as the expected Project completion date.  McPhee points out that there is no date in the Subcontract by which SPL was assured of completing its work, nor is the duration of the work guaranteed by the Subcontract.  There is no schedule of work attached to the Subcontract, not even a time within which SPL is guaranteed to start work.  In addition, McPhee submits that SPL has not presented any schedule analysis to prove that if there was delay, who is responsible for the delay and how much a party would be responsible for the delay.

60) McPhee also argues that the addition of Phase II changed the Project completion dates to January 2008 for the Convention Center and March 2008 for the Hotel.  The Phase II scope of work was contained in Change Order No. 1.  As set forth in Paragraph 38 of this Memorandum

SPL agreed when accepting the change order:

> [T]hat this change order adjusts the subcontract amount and time, and fairly reflects all overhead, profit, costs, delays, damages and other payments that may be claimed due and owing to the subcontractor as of the above stated date, and agrees that acceptance represents final settlement of the subcontractor's claims against the General Contractor and the Owner as a result of this or any prior changes in the work.

61) McPhee further claims that SPL's Subcontract terms, the SPL lien and claim releases,

and all four of SPL's change orders contain language waiving any claim for delay-related

damages.

62) McPhee states that the Subcontract contains a "pay-if-paid" clause in Article 5.1.2.

McPhee submits that it has never been paid by either MTR or PTJV for the claims submitted by

SPL.

63) In November 2007, SPL submitted to McPhee a claim for alleged compression.

Compression claims occur when the owner directs the completion of more work than originally

contracted for in the same amount of time as specified in the contract.  In January 2008 SPL

submitted a revised claim for alleged inefficiency/compression to McPhee.  This claim was

advanced by McPhee through MTR to PTJV.  McPhee contends that advancing the claim did not

amount to a waiver of the "paid-if-pay" provision of the subcontract and the SPL lien releases,

and that SPL understood it would only be paid if Gaylord approved the claim.  Gaylord

requested SPL to provide SPL's and NWS's original bid assumptions and their actual costs

incurred so that Gaylord could evaluate the claim.  The requested supporting documents were

not provided.

64) In October 2008, MTR filed suit in the Circuit Court of Maryland for Prince

George's County, *MTR Electrical Construction, LLC v. Gaylord National, LLC, et al.,* Civil

Action No. CAE 08-28598.  The suit contained a request for a mechanic's lien on the Project

property and a breach of contract claim.  MTR sought approximately $10,800,000 in damages.

Included in the damages were SPL's claim.

65) In August 2009, SPL presented McPhee with a revised claim that requested

additional compensation for compression/inefficiency.  As with prior claims, the August 2009

claim did not seek delay-related damages.  This claim was prepared using SPL's actual costs for

the project as opposed to prior claims where estimates of SPL's costs were used. Among the documents SPL relied upon for its claim was a spreadsheet created by NWS which NWS contends compares actual hours on the project (regular and overtime) against the labor hours (regular and overtime) it anticipated incurring in its bid.

66) PTJV hired an independent auditor, Navigant Consulting, Inc. ("Navigant") to perform an audit of MTR's financials for the Project and the financial records of all entities that were claiming payment due from PTJV including SPL. Navigant reviewed the applicable records to evaluate SPL's claims, including all claims submitted to McPhee by SPL. Navigant opined in a report prepared by Steven Reighard that SPL had not suffered any loss on the Project and that SPL had earned nearly the exact amount of profit for its work on the Project as it anticipated in its bid. MTR and PTJV entered into a full and final settlement resolving their outstanding financial disputes where PTJV paid MTR $3,112,500. McPhee's representative testified that PTJV carved out of MTR's claim any money for SPL's claims and that PTJV paid MTR no money for any of SPL's claims.[2] Since the Subcontract's express condition precedent - payment to McPhee for SPL's claims - never occurred, McPhee submits it was under no obligation to pay SPL's claims.

67) SPL sharply criticizes the Navigant Report arguing that Mr. Reighard did not audit the numbers contained in SPL's job cost report, spoke with no one from SPL prior to issuing his report, and performed no analysis of NWS's claims or costs. SPL contends that Mr. Reighard

---

[2] SPL objects to the testimony of Makary, McPhee and Conroy ("Makary"), suggesting no money from the settlement was to be paid to SPL, as violating the parol evidence rule as the Final Settlement and Release Agreement of December 10, 2009 resolving the Prince George's County Circuit Court case contains an integration clause stating that the settlement agreement constitutes the entire agreement and understanding of the parties. There is no explanation of how the settlement figure was derived in the five page agreement. SPL also alleges that Makary was not present at the settlement and therefore was not privy to settlement discussions.

looked at SPL's original estimate and its actual costs to determine whether or not SPL made its anticipated profit on the Project.

68) SPL allege that the distribution of the settlement proceeds from the state court case were the result of collusion between the parties. SPL highlights that Tech, which is owned by Truland, received $900,000 for claims similar to those advanced by SPL. Additionally, SPL asserts MTR has not made final profit distributions for the Project and is holding more than a half a million dollars in escrow until the instant litigation is resolved.

69) Finally, McPhee strongly disputes the validity of Mr. Trimbath's analysis on the delay-related damages. McPhee challenges Mr. Trimbath's position that only SPL's base contract work was performed during the January to March 2008 period. McPhee points to SPL's Payment Application No. 15 which certifies that base contract work was 100% complete by January 31, 2008 and that SPL's work beyond that date was primarily change order work for which SPL was already compensated. In addition, McPhee points out that Mr. Trimbath failed to consider the additional amounts paid to SPL in Change Order No. 1 for additional project management and onsite support through April 2008 due to the addition of Phase II. McPhee challenges Mr. Trimbath's work on the delay-related damages by faulting him for relying on inaccurate SPL labor burden reports, the Manshul decision (which has not been adopted in either Maryland or the United States Court of Appeals for the Fourth Circuit), and applying the incorrect SPL home office overhead rate in his calculations.

70) McPhee takes issue with the disruption-related damages calculated by Mr. Trimbath. Initially, McPhee alleges that Mr. Trimbath did not have sufficient data to perform an inefficiency analysis based on physical units installed as neither SPL's nor NWS's job records provide the required data. In addition, Mr. Trimbath omitted a critical step in his analysis by not

examining NWS's bid to determine if the bid or the assumptions contained within the bid were reasonable.  McPhee criticizes Mr. Trimbath's NWS inefficiency analysis calculations as it did in its response to his delay-related damages calculations, by noting that both calculations depend on the assumption that all work performed during the "most impacted" period (January 2008 through March 2008) was base contract work.  Such an assumption fails to account for the possibility that hours spent by NWS and its subcontractors during the "most impacted" period may have been expended on change order work.

71) McPhee faults Mr. Trimbath for including discretionary bonuses paid by SPL to its employees as a recoverable cost against McPhee arguing that under Generally Accepted Accounting Principles "(GAAP")" bonuses paid to employees are part of a company's corporate overhead and not directly charged to a particular project.  In addition, there is no evidence that SPL charged the discretionary bonuses to the Project.

72) McPhee also finds fault with Mr. Trimbath's calculation of the NWS overtime premium because it is not based on NWS's bid assumption for labor hours.  The core document that Mr. Trimbath used to calculate NWS overtime premium - the NWS compression spreadsheet - appears inaccurate.  NWS and WAV often paid their employees for travel time in addition to work time on the job site.  The travel time incurred by NWS totals 968.25 hours which is exceptionally close to the additional NWS overtime calculated by Mr. Trimbath at 957.6 hours. McPhee argues that NWS estimated the number of labor hours it anticipated actually working on the Project site, and underbid its employee travel time for its employees to commute between the NWS office and the Project site.  If this is the case, which the closeness of the numbers would indicate, the additional overtime premium for NWS is not chargeable to McPhee.

73) McPhee takes exception with Mr. Trimbath's interest calculation pursuant to the

Maryland Prompt Payment Act.  Mr. Trimbath calculated interest from the dates SPL's Payment

Applications Nos. 20-2 and 20-3 were submitted, rather from the date that SPL claims McPhee

received payment for SPL's Payment Applications in January 2010.

74) McPhee contends that SPL has suffered no damages as a result of any action by

McPhee as SPL earned almost exactly the amount of profit on the Project that it anticipated

when bidding the Project.  SPL's bid projected a profit margin of $1,299,616 or 13.94%.  Citing

to the findings of Navigant following an examination of MTR's financials for the Project and the

financial records of all entities claiming payment due from PTJV including SPL, Navigant found

SPL had earned a profit of $1,250,877.

75) A breach of contract counterclaim was filed by McPhee against SPL.  In that claim

McPhee alleges SPL entered into a third tier subcontract on April 9, 2007 with Tech to perform

audio-visual cable installation work at the Project site.  SPL also requested Tech perform

additional work on the Project outside of the scope of the third tier subcontract.  McPhee alleges

SPL has failed to pay Tech $580,433.  This sum is composed of a $32,500 contract balance and

an additional work claim due to compression of $547,933.  Tech assigned to McPhee all right,

title and interest to payment it has to the Tech third tier subcontract.  McPhee acknowledged in

its counter-complaint an outstanding balance on its SPL sub-contract in the amount of $201,651.

Giving SPL credit for its SPL sub-contract balance, McPhee alleges that SPL owes McPhee

$378,782.

76) During the trial McPhee offered no evidence to substantiate the $547,933

compression claim or evidence verifying that Tech actually incurred such costs.

<u>APPLICABLE LAW</u>

At the inception the court notes that since this court's jurisdiction is based on diversity of

citizenship, the principles outlined in *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 78 (1938) require the application of Maryland law to substantive law questions.

Maryland law provides, when a contract is plain and unambiguous, there is no room for construction, because the parties are presumed to have intended what they expressed. *Board of Trustees of State Colleges v. Sherman*, 280 Md. 373, 373 A.2d 626 (1977). The primary source for determining the intention of the parties is the language of the contract itself. *Ragan v. Porter Hayden Co.*, 133 Md. App. 116, 754 A.2d 503, *cert denied*, 361 Md. 232, 760 A.2d 1107 (2000). A contracting party is in no manner bound by the assumptions or beliefs of the other contracting party, but is rather bound by the contract itself. *Gill v. Computer Equipment Corp.,* 266 Md. 170, 292 A.2d 1302 (1979).

As a general rule, the parties to a valid contract are bound to perform it according to its terms, or else respond in damages. *Shell Oil Co. v. Parker*, 256 Md. 631, 291 A.2d 64 (1972). A breach of contract is a failure without legal excuse to perform any promise forming the whole or part of a contract. *Loch Hill Construction Co. v. Fricke*, 284 Md. 708, 399 A.2d 883 (1979). The performance required will be defined by the terms of the contract, and when an act is defined and required, it will be enforced. *Parker v. Columbia Bank*, 91 Md. App. 346, 604 A.2d 521 (1992).

Parties to a contract may waive the requirements of the contract by subsequent oral agreement or conduct, notwithstanding any provision in the contract that modifications must be in writing. *Hoffman v. Glock*, 20 Md. App. 284, 288, 315 A.2d 551 (1974); *see Freeman v. Stanbern Construction Co.*, 205 Md. 71, 79, 106 A.2d 50 (1954). If a provision in the contract requires modifications to be in writing, it must be shown, either by express agreement or by implication, that the parties understood that provision was to be waived. *Freeman*, 205 Md. at

79, 106 A.2d 50.  Subsequent oral modification of a written agreement may be established by a preponderance of the evidence. *Id.*  Whether or not the subsequent conduct of the parties amounts to a waiver is a question of fact to be decided by the trier of fact.  *Hoffman,* 20 Md. App. at 289, 315 A.2d 551 (citing *Bartlett v. Stanchfield*, 148 Mass. 394, 395, 19 N.E. 549 (1889)).

Under Maryland law, releases are contracts and are construed and applied according to the rules of contract law.  *Owens-Illinois, Inc. v. Cook,* 386 Md. 468, 495, 872 A.2d. 969, 984 (2005).  A release is to be construed according to the intent of the parties and the object and purpose of the instrument, and that intent will control and limit its operation.  *Shriver v. Carlin & Fulton Co.,* 155 Md. 51, 64, 141 A. 434, 440 (1928).  Maryland follows the objective law of contract interpretation and construction.  *Taylor v. NationsBank, N.A.,* 365 Md. 166, 178-79, 776 A.2d 645, 653 (2001).

Maryland law provides a statutory remedy to construction contractors for non-payment. The remedy is contained in the Prompt Payment Act (the "Act") at Md. Code Ann., Real Prop. § 9-301 *et seq.*  The Act entitles a contractor or subcontractor that performs work or furnishes materials for a property under a "contract" to prompt payment.  The Act requires payments from an "owner" of "undisputed amounts owed under the terms of the written contract" within thirty days after the occupancy permit is granted or the owner takes possession of the property or within seven days of the date required for payment under the written contract.  In this case the contract is not with an "owner."

If the contract is not with an "owner," payment must be made to contractors or subcontractors within seven days "after receipt by the contractor or subcontractor of each payment received for its subcontractors' work or materials."  Under the Act, the "undisputed

amount" is defined as "an amount owed on a contract for which there is no good faith dispute, including any retainage withheld." What constitutes "good faith" is not defined by the Act.

The Act does permit an owner or contractor to withhold "retention proceeds" if called for in the parties' written agreement. This exception for retainage only applies to contracted amounts over $250,000.

A court may award interest at the legal rate from the date the court determines that the amount owed was due as well as any reasonable costs incurred. Attorneys' fees may only be awarded if the owner, contractor, or subcontractor has acted in bad faith by failing to pay any undisputed amounts.

## ANALYSIS

Pending before the court for adjudication are SPL's breach of contract claim and its claim for damages under the Maryland Prompt Payment Act. Also pending is McPhee's one count counterclaim against SPL alleging breach of contract. The burden of proof rests with the party asserting a claim. The court will first consider SPL's breach of contract claim.

A contract exists between SPL and McPhee governing the work that SPL was to perform on the Gaylord National Resort and Convention Center. The contract consists of the lump sum Subcontract for all the audio-visual work on the Project in the amount of $7,240,293. This Subcontract was executed by SPL on December 18, 2006 and by McPhee on December 19, 2006.

SPL and McPhee executed four written Change Orders to the Subcontract. Change Order No. 1 in the amount of $747,393.13 was accepted by McPhee on June 20, 2007 and by SPL on June 22, 2007. Change Order No. 2 in the amount of $162,122.77 was accepted by McPhee on December 10, 2007 and by SPL on December 4, 2007. Change Order No. 3 in the amount of

$617,588.48 was accepted by McPhee on January 24, 2008 and by SPL on January 17, 2008.

Change Order No. 4 in the amount of $240,919 was accepted by McPhee on June 5, 2008 and by

SPL on May 21, 2008.  The adjusted contract value, including the four signed change orders

referenced above between SPL and McPhee, was $9,010,316.

Contained within the Subcontract and Change Orders are several clauses that

significantly bear on the adjudication of this case.  These clauses are binding on both the plaintiff

and defendant.  The Subcontract contains an integration clause which provides that the

Subcontract "represents the entire and integrated Agreement between the parties hereto and

supersedes all prior negotiations, representations, or agreements, either written or verbal."  (14.9

ENTIRE AGREEMENT).

The Subcontract also provides for changes in the schedule of work as well as work

interruptions.  Two provisions are on point.  "Subcontractor recognizes that scheduling of the

work is the exclusive right of the Contractor and Subcontractor agrees to adhere to schedule

changes without any additional compensation."  (3.2 SCHEDULE CHANGES).  "The

Subcontractor shall promptly increase its work force, accelerate its performance, work overtime,

work Saturdays, Sundays and holidays, all without additional compensation, if, in the opinion of

the Contractor, such Work is necessary to maintain progress in accord with the Schedule of

Work...No premium time will be acknowledged or paid unless pursuant to a written agreement to

do so by the Contractor."  (8.9 PROGRESS AND PERFORMANCE).

The Subcontract is clear that any changes to the Subcontract must be accomplished

through a Change Order.  "The Subcontractor shall not be entitled to, nor shall it receive, any

increase in the Subcontract price or increase in the time for performance of the Work except

upon the written Change Order from the Contractor."  (6.1 CHANGES).  "The Contractor may

order changes, additions, or deletions in the Work by written Change Order.  Any change or

adjustment in the Contract price by virtue of such Change Order shall be specifically stated in

said Change Order...Any extension of time needed as a result of a proposed Change Order shall

be requested by the Subcontractor in writing prior to the issuance of the Change Order and shall

be incorporated therein to the extent required by the change." (6.2.1 CHANGE ORDER).

        The court notes that on the front of each of the four Change Orders signed by the parties

the following language appears: "The subcontractor further agrees that this change order adjusts

the subcontract amount and time, and fairly reflects all over head, profit, costs, delays, damages

and other payments that may be claimed due and owing to the subcontractor as of the above

stated date, and agrees that acceptance represents final settlement of the subcontractor's claims

against the General Contractor and the Owner as a result of this or any prior changes in the

work."

        The court also notes that each time SPL received a progress payment from McPhee, a

Partial Lien Release, Bond Release and Affidavit would be submitted by SPL attesting that SPL

"does hereby acknowledge payment in full (except retainage) and does hereby release and

discharge the Owner of the real estate and/or improvements thereon, McPhee Electric Ltd. and

its Payment and Performance Bond Surety, from all debts, demands, or claims arising from the

project to the date of the requisition for which payment is made."

        McPhee and SPL also provided in the Subcontract that SPL must give notice to McPhee

within five working days from the commencement of any happening that gives rise to a claim.

Failure of SPL to make timely claims to McPhee bound SPL to the same consequences as to

those which bound McPhee if McPhee failed to make a timely claim.

        Finally, the court notes the Subcontract contains a severability and waiver provision

which states, "The failure of either party hereto insist, in one or more instances, upon the performance of any of the terms, covenants or conditions of this Subcontract, or to exercise any right herein, shall not be construed as a waiver or relinquishment of such terms, covenant, condition or right as respects further performance." (14.7 SEVERABILITY AND WAIVER).

It is clear that the language contained in the Subcontract, four Change Orders, Payment Applications, and the Partial Lien Releases, Bond Releases and Affidavits ("SPL Lien Releases"), submitted by SPL to McPhee in exchange for receipt of progress payments for work performed, provide McPhee with very strong legal defenses to all of SPL's claims. These provisions bar SPL's claims.

SPL argues that its claims should not be barred as McPhee waived the above contractual provisions by its actions. SPL points to communications from McPhee requesting information as to how SPL derived its compression numbers, requesting supporting documentation such as certified payrolls, actual estimates, a breakdown of the overtime hours spent by SPL and its subcontractors, subcontractors' original pricing breakdown, and documentation supporting SPL's inefficiencies claim. SPL had communications with McPhee concerning the status of its claims and was assured that once MTR was paid, it would pay SPL. In addition, no one advised SPL that the Subcontract precluded SPL from seeking additional compensation.

McPhee counters that it had no intent of - and did not believe it was - waiving its rights under the Subcontract, SPL Lien Releases, Payment Applications, and the Change Orders by allowing SPL to advance its claims. McPhee was merely facilitating the advancement of SPL's claims by requesting information and replying to SPL's inquiries concerning the claims process, not waiving any of its legal rights under the Subcontract, SPL Lien Releases, Payment Applications, and the Change Orders. McPhee stresses that SPL knew that it would only be

entitled to recover amounts for its claims, if MTR prevailed in the Gaylord Litigation and was

paid by PTJV for SPL's claims.

Parties to a contract may waive the requirements of the contract by writing or by

subsequent oral agreement or conduct.  If a contract requires modifications to be in writing, it

must be shown, either by express agreement or by implication, that the parties understood that

provision was to be waived.  Here, the Subcontract was modified by the parties on four

occasions.  On each occasion the Subcontract was modified in writing through the use of a

change order.  These four change orders were significant in that they increased the Subcontract

amount from $7,240,293 to $9,010,316, an increase of $1,770,023 or 24%.

The burden is upon SPL to establish by a preponderance of the evidence that McPhee

waived its legal defenses to the claims now asserted by SPL.  This is a question of fact to be

decided by the trier of fact.  After a review of all the evidence, the court is not convinced that

SPL has established that McPhee has waived its legal defenses to SPL's claims.  McPhee denies

it had any intention of waiving its legal defenses.  When McPhee wanted to alter the Subcontract

it did so in writing through change orders.  McPhee's conduct, in permitting the presentment and

advancement of SPL's claims and conditioning any payment on PTJV paying MTR for SPL's

claims, is not inconsistent with its non-waiver position.  The court finds SPL's claims are barred

by the legal defenses available to McPhee under the Subcontract, Change Orders, SPL Lien

Releases, and Payment Applications.

Even if the court found that McPhee had waived its legal defenses, the court remains

unpersuaded that SPL has met its burden in establishing its entitlement to inefficiency or

compression damages and delay-related damages.  SPL purchased NWS's claim for inefficiency.

NWS maintained no contemporaneous records of its labor and thus SPL has no basis to evaluate

NWS's efficiency.  SPL failed to establish that NWS's underlying bid assumptions for labor were appropriate.  Use of a spreadsheet containing incorrect data in producing a NWS inefficiency analysis is problematic.

The delay-related damage claim is flawed because it rests upon the assumption that only base contract work was performed by SPL and its subcontractors during the alleged period, an assumption inconsistent with the evidence.  In addition, the Subcontract contains no specific completion date and evidence is lacking that SPL was actually delayed.

The court does find that there is a contract balance owed by McPhee to SPL in the amount of $10,624.  A judgment in this amount along with Maryland's statutory prejudgment simple interest of six percent (6%) per annum will be entered in favor of SPL against McPhee. The court will grant six (6) years of prejudgment interest at $637.44 per year for a total prejudgment interest calculation of $3,824.64.   The total judgment will be $14,448.64.

The court finds no entitlement for an award under the Prompt Payment Act as the conditions required for such an award are not present in this case.

McPhee's counterclaim against SPL was not proven at trial and will be dismissed by the court.

A judgment consistent with this opinion will be entered by the court.


January 6, 2015                                   _____/s/_____
                                                  WILLIAM CONNELLY
                                                  UNITED STATES MAGISTRATE JUDGE