**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| **SIGNAL PERFECTION, LTD.** ) | |
| ) | |
| **Plaintiff/Counter-Defendant,** ) | |
| ) | |
| **v.** ) | **Civil Action No. WGC-10-2331** |
| ) | |
| **MCPHEE ELECTRIC, LTD.** ) | |
| ) | |
| **Defendant/Counter-Plaintiff** ) | |
| ) | |

## MEMORANDUM OPINION

A five day bench trial was held from January 14-18, 2013.  On January 6, 2015 the court issued a Memorandum Opinion and Order.  *See* ECF Nos. 125-126.  Judgment was entered in favor of Signal Perfection, Ltd. (hereinafter "SPL") and against McPhee Electric, Ltd. (hereinafter "McPhee") in the amount of $14,448.64 (inclusive of prejudgment interest). McPhee's counterclaim was dismissed.

Twenty-eight days later, on February 3, 2015, SPL moved for a new trial or, in the alternative, moved to alter or amend judgment.  *See* ECF No. 127.  McPhee filed a response in opposition.  *See* ECF No. 130.  SPL filed a reply in support of its motion.  *See* ECF No. 133.

The same day McPhee filed its response in opposition, it moved to strike the Affidavit of Frederick Curdts.  *See* ECF No. 131.  SPL filed a response in opposition, *see* ECF No. 132. McPhee filed a reply in support of its motion, *see* ECF No. 134, and a supplemental to its reply, *see* ECF No. 135.

It is undisputed that SPL timely moved for a new trial or, in the alternative, to alter or amend judgment in accordance with Federal Rules of Civil Procedure 52(b), 59(b), (e).  No

hearing is deemed necessary and the court now rules pursuant to Local Rule 105.6 (D. Md. 2014).

## STANDARD OF REVIEW

A party may move for a new trial in accordance with Federal Rule of Civil Procedure 59. The grounds for moving for a new trial following a nonjury trial are broad, *i.e.,* "for any reason for which a rehearing has heretofore been granted in a suit in equity in federal court." Fed. R. Civ. P. 59(a)(1)(B). "[T]he general grounds for a new trial is that the verdict is against the weight of the evidence, that the damages are excessive, or that for other reasons the trial was not fair and that the motion may also raise questions of law arising out of substantial errors in the admission or rejection of evidence." 11 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE §2805 (2012). In other words, "[a] motion for a new trial in a non-jury case . . . should be based upon manifest error of law or mistake of fact, and a judgment should not be set aside except for substantial reasons." *United States v. Carolina Eastern Chemical Co.*, 639 F. Supp. 1420, 1423 (D.S.C. 1986) (citing *Hager v. Paul Revere Life Insurance Co.*, 489 F. Supp. 317, 321 (E.D. Tenn. 1977)). When a party moves for a new trial after a nonjury trial, a court may "open the judgment if one has been entered, take additional testimony, amend findings of fact and conclusions of law or make new ones, and direct the entry of a new judgment." Fed. R. Civ. P. 59(a)(2).

When a case is tried without a jury, Federal Rule of Civil Procedure 52(a)(1) mandates the court "find[s] the facts specially and state[s] its conclusions of law separately." Once the court issues its findings of fact and conclusions of law, a party may question the sufficiency of the evidence supporting the court's findings. Fed. R. Civ. P. 52(a)(5). The court's findings of fact however cannot be set aside "unless clearly erroneous." Fed. R. Civ. P. 52(a)(6).

Pursuant to Federal Rule of Civil Procedure 52(b), a party may move and the court may amend its findings or make additional findings and may amend the judgment accordingly. In essence, a Rule 52(b) motion "is intended to correct manifest errors of law or fact or to present newly discovered evidence." *Carolina Eastern Chemical*, 639 F. Supp. at 1423 (citing *Evans, Inc. v. Tiffany & Co.*, 416 F. Supp. 224 (N.D. Ill. 1976)). A Rule 52(b) motion to amend findings or make additional findings may accompany a Rule 59 motion for a new trial.

A party may move to alter or amend a judgment under Rule 59(e). "[R]econsideration of a judgment after its entry is an extraordinary remedy which should be used sparingly." 11 WRIGHT, MILLER & KANE, FEDERAL PRACTICE AND PROCEDURE §2810.1 (2012) The United States Court of Appeals for the Fourth Circuit recognizes three grounds for amending an earlier judgment: "(1) to accommodate an intervening change in controlling law; (2) to account for new evidence not available at trial; or (3) to correct a clear error of law or prevent manifest injustice." *Pacific Insurance Co. v. American Nat'l Fire Insurance Co.*, 148 F.3d 396, 403 (4th Cir. 1998). "Rule 59(e) motions may not be used . . . to raise arguments which could have been raised prior to the issuance of the judgment, nor may they be used to argue a case under a novel legal theory that the party had the ability to address in the first instance." *Id.*

## DISCUSSION

SPL alleges seven (7) errors by the court in its January 6, 2015 Memorandum Opinion. *See* ECF No. 128 at 1-2. The court considers below these alleged errors.

A.     *SPL's Objections to John Conroy as McPhee's Hybrid Fact/Expert Witness*

1.     *Absence of a Written Report*

SPL raises several arguments concerning the testimony of McPhee's expert, John Conroy ("Mr. Conroy"). Preliminarily, SPL contends the court erroneously overruled its objection to

Mr. Conroy testifying as a hybrid fact/expert witness without an expert report, especially in light of Mr. Conroy's "contingent financial interest" in the outcome of the litigation.

McPhee designated Mr. Conroy as hybrid fact/expert witness in its February 25, 2011 Rule 26(a)(2) Expert Disclosures. *See* ECF No. 130-1 at 1-5. A hybrid fact/expert witness is not required to provide a written report like an expert retained or specially employed to provide expert testimony in a case. Further, by definition, a hybrid fact/expert witness is not required to provide a written report because he is not an individual whose duty as an employee of a party involves regularly giving expert testimony. *See* Fed. R. Civ. P. 26(a)(2)(B). The disclosures of a hybrid fact/expert witness are governed by Federal Rule of Civil Procedure 26(a)(2)(C) which states:

> (C) *Witnesses Who Do Not Provide a Written Report.* Unless otherwise stipulated or ordered by the court, if the witness is not required to provide a written report, this disclosure must state:
>
> (i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and
>
> (ii) a summary of the facts and opinions to which the witness is expected to testify.

This court's Local Rule provides additional guidance concerning hybrid fact/expert witnesses stating in pertinent part:

> The disclosures [required by Federal Rule of Civil Procedure 26(a)(2)(B)] need not be provided as to hybrid fact/expert witnesses such as treating physicians. The party must disclose the existence of any hybrid fact/expert witness pursuant to Fed. R. Civ. P. 26(a)(2)(A), and disclose the subject matter on which the witness is expected to present evidence under Fed. R. Evid. 702, 703, or 705, as well as a summary of the facts and opinions to which the hybrid fact/expert witness is expected to testify, pursuant to Fed. R. Civ. P. 26(a)(2)(C). In addition, an adverse party may obtain the opinions of such witnesses (to the extent appropriate) through interrogatories, document production requests, and depositions.

Local Rule 104.10 (D. Md. 2014).

A review of McPhee's Rule 26(a)(2) expert disclosures reveals McPhee complied with the federal rules.  The first three paragraphs of McPhee's expert disclosure as to Mr. Conroy state:

> Mr. John Conroy, McPhee Electric, Ltd., 505 Main Street, Farmington, Connecticut.  Mr. Conroy is the Chief Financial Officer of McPhee and a Certified Public Accountant with expertise in all areas of construction accounting and financial management.  Mr. Conroy is not a witness retained or specially employed to provide expert testimony in this case.  Accordingly, he is not required to prepare a written report under Federal Rule of Civil Procedure 26(a)(2)(B) and has not done so.
>
> In accordance with Federal Rule of Civil Procedure 26(a)(2)(C)(i), McPhee may designate Mr. Conroy as a hybrid fact/ expert witness to present evidence under Rules 702, 703 or 705 of the Federal Rules of Evidence as follows: construction accounting; cost-plus accounting; SPL's estimate for the Project including, but not limited to, its anticipated general conditions to perform the subcontract, and the allocation of home office overhead to the subcontract; the anticipated cost to perform the Audio Visual scope of work for the Project; analysis of SPL's accounting records and job costs records for the Project; the numerous delay, acceleration and inefficiency claims submitted by SPL; analysis of the numerous delay, acceleration and inefficiency claims submitted by SPL, including the expert report prepared by The Duggan Rhodes Group ("DRG") dated January 26, 2011; the veracity of SPL's expert report prepared by DRG dated January 26, 2011; the veracity of SPL's claimed damages; the absence of damage to SPL for any reason for which it has not previously been fully compensated; and, SPL's lack of entitlement to its claimed damages.
>
> Further, in accordance with Federal Rule of Civil Procedure 26(a)(2)(C)(ii), a summary of the facts and/or opinions to which Mr. Conroy is expected to testify includes, but is not limited to the following[.]

ECF No. 130-1 at 1-2.  McPhee divides this summary into four subcategories — (a) SPL's Damages for Outstanding Contract, (b) SPL's Delay-Related Damages, (c) SPL's Disruption-

Related Damages and (d) SPL's Claimed Costs for Interest.  These four subcategories consist of twenty-one (21) bullet points.  *See* ECF No. 130-1 at 2-5.

Despite McPhee providing SPL with a summary of the facts and opinions to which Mr. Conroy was expected to testify pursuant to Rule 26(a)(2)(C), SPL nonetheless objected to Mr. Conroy's testimony during the trial.

> Q       So from that spreadsheet of the totality of the NWS labor, what were you able to do to analyze the labor on the project?
>
> MR. COHEN:        Your Honor, I'm going to interpose an objection at this point.  It appears that the expert is going to offer his own calculations, which have never been provided to us. There is no expert report.  So obviously, the courts have commonly held that experts can't testify without a report.  So we're now – – whatever he's going to show us is something we've never seen, never been provided to us and we raise an objection to this.
>
> THE COURT:        Mr. Seeger?
>
> MR. SEEGER:        Your Honor, this was addressed in a previous motion in limine, has been ruled on by the Court.  This ship has sailed as it relates to any complaints about the sufficiency of the disclosure as it relates to Mr. Conroy as to whether or not Mr. Conroy was required as a hybrid fact expert to have provided a written report in the first instance.  There was a deposition of Mr. Conroy.  There was opportunity by the plaintiff to inquire about anything in his disclosure at the deposition.  They did not inquire as to these areas.  And if they had wanted such a document, it could have been asked for more than a year ago.
>
> MR. COHEN:        So the deposition of Mr. Conroy I believe was in March of 2011.  And certainly, I'm not certain whether he had been designated as an expert by then.  But even so, there should be a requirement that he be required to provide us with whatever he's going to testify.  He's never done that.  So whatever the Court is going to see, we are going to see for the first time.  And that's highly unusual in taking any kind of expert testimony.  If he were a rebuttal fact witness, it's one thing.  But for him to be putting up his own work as an expert without ever having shared it with opposing counsel just goes to the core of unfairness.

>          MR. SEEGER:          Your Honor, to be clear, the expert disclosure for Mr. Conroy was February 25, 2011, a month before his deposition.
>
>          MR. COHEN:          But again, he had provided no expert report and never did provide an expert report.
>
>          THE COURT:          Well, he's not required if he's a hybrid fact expert witness.
>
>          MR. COHEN:          Well, again, if it's the fact part of it, it's one thing.  But if he's going to try and offer this as an expert, it puts the – – I mean we certainly are capable of cross-examining him on what he said.  But to have a work product that was never being put forth.  Your Honor expressed concern about an expert report that my expert offered in November of 2011 suggesting that they could be disadvantaged.  I'm now anticipating that we are all going to look at something that I have never even laid eyes on and this is in the fourth or fifth day of trial.  I think there is undue fairness to us, Your Honor.
>
>          THE COURT:          I'm going to deny your motion at time.  Let me take the testimony and see what comes of this.

ECF No. 121 at 74-76 (Trial Tr. 74:16 - 76:22, Jan. 17, 2013).

Because Mr. Conroy was a hybrid fact/expert witness, McPhee was not required to serve SPL with a Rule 26(a)(2)(B) written report.  Instead, McPhee served SPL with a summary of Mr. Conroy's facts and opinions which is in accordance with Rule 26(a)(2)(C).  The court addressed SPL's objections to Mr. Conroy and explained its rationale for permitting him to testify as a hybrid fact/expert witness.

>          THE COURT:          Okay.  In this case, Mr. Conroy has been proffered by the defense as an expert in construction accounting as well as claims analysis.  I've been presented with an individual who has his degree in financial accounting and also a Master of business administration I believe.  He is a licensed certified public accountant.  Although currently, it's not active simply because he's now in the private sector and that's not required.  I've also been told that he does have experience with Price Waterhouse which was a large national accounting firm for several years and then has worked with a large electrical utility on a very large nuclear power

> plant construction project, has testified before FERC and has spent a significant amount of time in the operational aspects of construction as well as monitoring construction costs and analyzing claims.
>
> Mr. Cohen is correct in that this is not the typical type of expert and that it's not a person who is a consultant or who does this a fair bit of his time. Rather I'm presented by somebody whose experience is operational in nature. The idea of an expert is somebody who has specialized knowledge, training and experience that can help the court in understanding aspects. I find that Mr. Conroy by virtue of his training, his licensure as well as it appears now some 20 years of experience hands on in cost accounting and claims analysis will – – fits this description.

ECF No. 121 at 38-39 (Trial Tr. 38:21 - 39:22, Jan. 17, 2013). The court finds it did not commit any error by permitting Mr. Conroy to testify without an "expert report" since the Rule 26(a)(2)(B) written report was not required and McPhee satisfied the requirements under Rule 26(a)(2)(C).

       *2.*     *Mr. Conroy's Alleged Contingent Financial Interest in Litigation*

Prior to the court permitting Mr. Conroy to testify as a hybrid fact/expert witness, SPL's counsel questioned Mr. Conroy and challenged his credibility based on his financial interest.

> Q      Isn't it also true that you are an owner of [Ph]alcon[, Ltd.]?
>
> A      I am a part owner of [Ph]alcon. That is true.
>
> Q      What is your percentage of ownership, sir?
>
> A      Ten percent.
>
> Q      As a result, [Ph]alcon is the owner of McPhee and J.R. Richards?
>
> A      J.E. Richards.
>
> Q      J.E. Richards. I apologize. Correct?
>
> A      Yes. Correct.

Q        Okay.   And at the present time, there is a sum of money, more than a half million dollars that's in an account that can't be released with regard to this particular project until there's been a decision made in this case.  Correct?

MR. SEEGER:        Your Honor, if I may object?  This is perfectly legitimate cross-examination of his credibility.  But as to his qualifications as an expert, it's irrelevant.

MR. COHEN:        Your Honor, I always thought that an independent expert had to be free from having a personal interest in the outcome of the case and that what he was going to lend was an independent look at something to help the Court on scientific matters.  This is a gentleman who has an ownership interest in this case and a direct stake in the outcome of this case. . . .

THE COURT:        But he's a hybrid fact expert witness, isn't he not?

MR. SEEGER:        Yes he is, Your Honor.

MR. COHEN:        He is being offered as a hybrid, but we object to the concept that he can be considered as an expert given his own personal involvement.

THE COURT:        Doesn't that go to weight though as opposed to admissibility and qualifications?  I mean I understand that he owns 10% of [Ph]alcon and I understand because I think this is now the third time that it's been brought to my attention that there's this $500,000 in escrow, which depends upon the outcome of this case, but I don't know whether or not that excludes him.  I think it goes to weight as to what I assign to his opinion.

ECF No. 121 at 33-34, 35 (Trial Tr. 33:20 - 34:20, 35:2-15, Jan. 17, 2013).

In moving for a new trial or alternatively to alter or amend judgment, SPL suggests Mr. Conroy supplied his expert testimony for a contingent fee or collected compensation for testifying as a hybrid fact/expert witness.  *See* ECF No. 128 at 11.  SPL presented *no evidence* to substantiate this allegation.  Mr. Conroy testified that he is employed by McPhee as its Chief Financial Officer ("CFO").  He is a partner of Phalcon, Ltd., the parent company of McPhee, J.E.

Richards Electric and JBL Electric.   Mr. Conroy likewise serves as the CFO to the other two

companies.   Mr. Conroy described his duties as the CFO for these companies as follows:

> A      A whole number of things.   I'm involved in all of the
> accounting that goes on. I get involved in all of our insurance, all
> of our benefits, our surety bonding, our credit line, meeting with
> our banks.   I get involved quite a bit in contract reviews and
> looking at billings from either contractors to us or looking at
> billings that we provide to our clients.   Be they general contractors
> or owners.

ECF No. 121 at 29-30 (Trial Tr. 29:25 - 30:7, Jan. 17, 2013).

　　　SPL relies upon the case of *Accrued Financial Services, Inc. v. Prime Retail, Inc.,* 298

F.3d 291, 300 (4th Cir. 2002) for the proposition that McPhee's designation of Mr. Conroy as its

hybrid fact/expert witness is an arrangement against public policy since (a) McPhee is supplying

expert testimony for a contingent fee because Mr. Conroy owns 10 percent interest of Phalcon,

which owns McPhee and (b) McPhee's financial interest in the outcome of this litigation.   The

underlying facts of *Accrued Financial* are completely distinguishable from the facts of this

litigation.   Accrued Financial Services, Inc. ("AFS") is a California corporation which conducts

audits for tenants in factory outlet malls and commercial buildings.   AFS collects payment from

tenants by retaining a percentage of any discrepancies it discovers upon auditing commercial

tenant leases.   "As part of its arrangement with tenant-clients, AFS requires that the tenant assign

to AFS all legal claims that the tenant has against the landlord and give AFS control over any

litigation that AFS might wish to initiate to enforce the claims."   *Id.* at 294.   The *Accrued*

*Financial* court characterized the relationship AFS has with its tenant-clients as "essentially

lawsuit-mining arrangements."   *Id.* at 298.   Against that backdrop, the court noted, "[t]o the

extent that AFS employees, as experts on the relationship between landlords and tenants in a

commercial context, planned to testify regarding the allegations in this litigation, AFS was

offering expert testimony for a contingent fee." *Id.* at 300.  McPhee offered Mr. Conroy as an

hybrid fact/expert witness in response to this litigation initiated by SPL.  No evidence has been

presented that Mr. Conroy is in "the business of" routinely providing expert testimony on issues

of construction accounting and claims analysis.  SPL's counsel elicited testimony disproving that

McPhee's engagement of Mr. Conroy in this litigation is comparable to AFS employees who

were presented as experts on the relationship between landlords and tenants in a commercial

context.

> BY MR. COHEN:
>
> Q      Mr. Conroy, have you ever been offered as an expert in a case before any tribunal?
>
> A      Not as an expert.  No.
>
> Q      Have you ever been engaged to put together a delay, disruption or inefficiency claim by any other entity other than perhaps your employer?
>
> A      Other than my employer, no.
>
> Q      Have you ever been engaged by any outside entity to put together or do an earned method value or a measured mile value for a client as opposed to someone you work for yourself?
>
> A      No.
>
> Q      Have you on behalf of any of your employers such as McPhee or the other related companies put together as an expert a claim for inefficiency or los[s] of productivity?
>
> A      Could you ask that again, please?  I missed the middle.
>
> Q      Have you as an employee of any of your companies ever put together a claim for delay, disruption or inefficiency on any project?
>
> A      Yes.

Q       Okay.   You certainly did not do that on Gaylord because that was a cost plus a fee case.  Right?

A       We never got to the point of doing that.   There was no reason under the contract – – construct that we had.

Q       Okay.   Tell me how many times you had actually put together a claim for delay, disruption or inefficiency?

A       I could think of five as I sit here.   There may be more. Actually, there is – – I could think of eight now as I go back.

Q       I'm sorry.  Were those ever presented to a court?

A       Yes.

Q       And did you testify?

A       As a fact witness.

ECF No. 121 at 36-37 (Trial Tr. 36:2 - 37:14, Jan. 17, 2013).

The court finds the facts of this case are more analogous to *Den norske Bank AS v. First National Bank*, 75 F.3d 49 (1st Cir. 1996) cited by McPhee.  In *Den norske* the plaintiff offered affidavits from current and former commercial loan officers regarding a common, industry-wide practice to allow a minority participant veto power over loan forgiveness arrangements during the 1985-86 timeframe.   The defendant asserted these affiants lacked the qualifications to provide expert testimony on banking industry practices.  The *Den norske* court particularly noted one affiant is a 40 year banking veteran.   *Id.* at 57.   "[Defendant] has not demonstrated to our satisfaction that [the 40 year banking veteran] would not be permitted to provide expert testimony at trial."   *Id.*   The *Den norske* court further rejected the defendant's contention that the affidavits offered were "self-serving" because the two affiants were employees of the plaintiff. "Once again, however, we are not persuaded that [the defendant] has demonstrated that the *expert qualifications* of these affiants are undermined by their present and former association

with [the plaintiff] so as to render their testimony *inadmissible*.  Of course, such matters may bear heavily on witness credibility, bias and the weight of the evidence.  But these are matters for the factfinder."  *Id.* at 58.

In this case the court found Mr. Conroy qualified to provide expert testimony based on his significant experience and education.  As noted during trial,

> [THE COURT]:       The issue as to the fact that Mr. Conroy does have an ownership interest in [Ph]alcon, there is this sum of money that's in escrow obviously is of significance.  But I think it goes to weight and certainly will allow Mr. Cohen to cross-examine on that at greater length.

ECF No. 121 at 39-40 (Trial Tr. 39:23 - 40:2, Jan. 17, 2013).  The court finds it did not commit reversible error by permitting Mr. Conroy to testify as a hybrid fact/expert witness despite his 10 percent ownership interest.

*3.       Court Adopting Mr. Conroy's Testimony without Addressing Weight Assigned, without Identifying Whether it Accepted Mr. Conroy's Testimony as Fact or Opinion Testimony*

SPL asserts this court erred by failing to specify the weight it accorded Mr. Conroy's testimony.   According to SPL this court should have identified in its January 6, 2015 Memorandum Opinion the portions of Mr. Conroy's testimony the court found as "fact" and the portions of Mr. Conroy's testimony the court determined as "opinion testimony."   SPL argues these errors by the court are especially prejudicial with regard to three critical issues:   (a) contract balance, (b) the intent of PTJV and (c) the intent of McPhee to waive contract provisions.  *See* ECF No. 128 at 12.  The court will address issue b, the intent of PTJV, when it considers SPL's assertion that the parol evidence rule bars testimony that none of the settlement monies were allocated for SPL's claims.  *See infra.*  The issue regarding Mr. Conroy's testimony as a fact witness versus his testimony as an expert witness was raised during the trial.

BY MR. COHEN:

Q        I wanted to go to the delay-related damages.  I think you testified yesterday about your thoughts on the delay-related damages.  When you testified about extended project management and onsite support, were you testifying as a fact witness or an expert?

A        Again, from what we talked about yesterday where we're looking at accounting records, looking at documentation produced in discovery, I would look at that in any event as the CFO of McPhee.  So, if that makes it a fact, I would have to say that's a fact.  But I don't understand the distinction, quite frankly.

Q        All right.  Well – –

THE COURT:        Yes, Mr. Seeger.

MR. SEEGER:        Your Honor, I'll object to this line of questioning.  Mr. Conroy does not have to divide himself into a fact and an expert witness.  He is a hybrid fact/expert witness.  He brings to the witness stand his factual knowledge as to what he did personally on the project and his expertise based upon his training and education.  He does not have to parse himself into different parts in order to answer questions.

MR. COHEN:        Your Honor – –

MR. SEEGER:        And he should not be forced to do that as part of the cross-examination.

MR. COHEN:        I think it's certainly fertile territory for the record to reflect which parts of his testimony are based on his factual knowledge and which part he's offering because you have credited him not as a construction claims expert but as a construction cost accounting expert.  So, his testimony in different parts, including one of these sections in here, it becomes important that this court – – that the record reflect what exactly he's just using his expertise on versus the facts, because on the fact section, Your Honor, he offered no documentation.  So, I think the record has to be clear.  He's a fact witness.  He only testifying from his memory unless he made a specific reference to a document.  If he's an expert, then he can testify based on his knowledge and experience in the industry as long as it relates to construction cost accounting.

> THE COURT:      I don't know whether he has the ability or any of us has the ability to separate out that which is based upon knowledge as the CFO of the company and what his opinion is.  I mean, I've listened to this and I have to make those weight analyses.  I understand that there were no documents as to here are the pile of checks that we sent or here are the wire transfers.    He was testifying from his own memory and I understand that.
>
> As to which answer is him as a fact witness, which answer is him as an expert or which answer he blends it together, it's difficult to parse and I can make that decision myself.  I don't really need that assistance.

ECF No. 119 at 24-26 (Trial Tr. 24:8 - 26:6, Jan. 18, 2013).

Because this case was tried without a jury, the court made findings of fact specifically and stated separately its conclusions of law in accordance with Rule 52(a)(1).  Before issuing its findings of fact and conclusions of law via a memorandum opinion, the court requested and the parties submitted proposed findings of fact and conclusions of law.  *See* ECF Nos. 122 (SPL), 123 (McPhee).  As the trier of fact, the court is the sole judge of the believability of witnesses and the sole judge of the weight of the evidence including evidence by expert testimony.  "The Court's Memorandum Opinion was insufficiently transparent and reasoned because the Court never assessed Conroy's credibility or made specific findings setting forth the weight the Court gave to Conroy's testimony."  ECF No. 128 at 12.  There is no requirement that the court identify the weight assigned to a witness's testimony.  SPL has not directed the court's attention to a rule or case law with such a mandate.  The court may indicate the believability of witnesses or the weight of evidence by referencing facts elicited at trial.  In making findings of fact and conclusions of law, "the judge need only make brief, definite, pertinent findings and conclusions upon the contested matters; there is no necessity for over-elaboration of detail or particularization of facts."  Fed. R. Civ. P. 52 advisory committee's note.

Contrary to SPL's assertion, the court was transparent about its assessment of Mr. Conroy's credibility and the favorable weight assigned to his testimony based on the following from the January 6, 2015 Memorandum Opinion:

> Even if the court found that McPhee had waived its legal defenses, the court *remains unpersuaded* that SPL has met its burden in establishing its entitlement to inefficiency or compression damages and delay-related damages. SPL purchased NWS's claim for inefficiency. NWS maintained no contemporaneous records of its labor and thus SPL has no basis to evaluate NWS's efficiency. SPL failed to establish that NWS's underlying bid assumptions for labor were appropriate. Use of a spreadsheet containing incorrect data in producing a NWS efficiency analysis is problematic.
>
> The delay-related damage claim is *flawed* because it rests upon the assumption that only base contract work was performed by SPL and its subcontractors during the alleged period, an assumption *inconsistent* with the evidence. In addition, the Subcontract contains no specific completion date and evidence is *lacking* that SPL was actually delayed.

ECF No. 125 at 31-32 (emphasis added).

The above conclusions of law are based on the evidence presented at trial including the testimony of Mr. Conroy. For example, in rebuttal, SPL recalled its expert witness, Donald L. Trimbath, who conceded Mr. Conroy properly found some discrepancies in his (Trimbath's) report.

> BY MR. COHEN:
>
> Q       Good morning, Mr. Trimbath.
>
> A       Good morning.
>
> Q       You were here in the courtroom yesterday when Mr. Conroy testified about some discrepancies he found in your expert report with regard to WAV damages?
>
> A       I was.

Q       Have you gone back to check to see whether there was, in fact, some hours billed at $47 an hour rather than $50 an hour?

A       There were.

Q       Have you done a calculation as to how much that would reduce the calculation that you made with regard to the Nelson White premium paid for additional labor?

A       Yes, I did.

Q       How much is that?

A       I produced the schedule to counsel with the calculation. Approximately 1,100 hours were billed at the lower rate of 47.50. Based upon a difference of two dollars and 50 cents, that would be approximately $2,700.

*                                    *                                    *

        THE WITNESS:       And with a five percent markup, there would be a reduction of approximately $3,000.

BY MR. COHEN:

Q       I'm sorry.  What would be 3,000?

A       There would be a reduction of approximately $3,000 to the amount that I had previously calculated for the premium portion for WAV.

Q       Is that only for the change between the $47.50 and the $50 an hour?

A       Yes.

Q       Now, was there also some – – you  heard some testimony about some WAV change order hours during the period from March 7th to March 27th?

A       I did.

Q       Did you go back and calculate how many overtime or change order hours Mr. Conroy had identified yesterday?

> A      I reviewed all of the WAV daily reports and for the period
> of time in March, there were approximately 110 and a half hours
> that are designated as change orders on their report.  Based upon
> that and the calculation that I had for inefficiency, I would take out
> those 110.5 hours.  They would not be for reimbursement due to
> the inefficiency.  I had calculated that cost at 26 dollars and
> approximately 20 cents. That multiplication would be the 110.5
> hours times the $26.30[sic], plus the five percent markup, which I
> do not have the calculation in front of me, but that is also
> approximately about $3,000.

ECF No. 119 at 55-57 (Trial Tr. 55:7-25, 56:4 - 57:4, Jan. 18, 2013).

### a. Contract Balance Owed to SPL

As proof of the court's acceptance of Mr. Conroy's testimony over purported contrary evidence, SPL cites the court finding McPhee owed SPL $10,624 rather than $226,752.59, an amount first acknowledged by Mr. Conroy's staff assistant Ellen Gallant and previously by Mr. Conroy himself.  *See* ECF No. 128 at 14.  In the Memorandum Opinion of January 6, 2015 the court made extensive findings regarding what SPL and its expert claimed McPhee owed SPL. *See* ECF No. 125 at 13-18 (¶¶ 44-56).  The court similarly made extensive findings of McPhee's challenges to these claimed damages.  *Id.* at 18-24 (¶¶ 57-74).

As for SPL's reliance on Ms. Gallant's accounting e-mail of October 2008 indicating that McPhee owed SPL $226,752, *see* ECF No. 119 at 7-10 (Trial Tr. 7:24 - 10:8, Jan. 18, 2013), Mr. Conroy testified that Ms. Gallant's calculation proved to be incorrect, *see id.* at 48-51 (Trial Tr. 48:8 - 51:17, Jan. 18, 2013).  More importantly, in determining the contract balance owed to SPL, the court relied upon McPhee's accounting records[1] showing it had paid-to-date $8,970,412 to SPL.  *See* ECF No. 121 at 123 (Trial Tr. 123:5-7, Jan. 17, 2013).  The court found the

---

[1] Alternatively the court could have relied upon SPL's accounts receivable aging report which reflect $9,028,582.36 in cash receipts, minus $57,834.19 (payment directly from Gaylord), for a total of $8,970,748.17 or $8,970,748 from McPhee to SPL.  As Mr. Conroy testified there is approximately $400 difference (actually $336) between what SPL's Aging Report shows SPL receiving from McPhee and what McPhee's accounting  records show it paid SPL. *See* ECF No. 121 at 120-23 (Trial Tr. 120:22 - 123:4, Jan. 17, 2013).

methodology utilized by Mr. Conroy[2] to determine the contract balance more persuasive than the methodology ("based upon outstanding invoices submitted by SPL to McPhee"[3]) employed by SPL's expert Mr. Trimbath.

The parties agree the total adjusted value of the Subcontract between McPhee and SPL with the four change orders totaled $9,010,316.  Subtracting the amount McPhee's accounting records indicate McPhee paid to SPL, *i.e.,* $8,970,412, leaves a balance of $39,904.  Mr. Conroy then testified about various deductions and credits that further adjusts this amount, namely,

| | |
|---|---|
| Contract Balance | $39,904 |
| Less: Credit OCIP | $25,102 |
| Plus: OCIP Credit related to Tech | $18,371 |
| Less: Unpaid balance to Tech | $22,560 |
| Amount McPhee Owes SPL | ***$10,613*** |

*See* ECF No. 121 at 123-26 (Trial Tr. 123:5 - 126:23, Jan. 17, 2013).

If the court instead relied on SPL's *own* accounts receivable aging report, the amount McPhee owes SPL would be similar to the above total, not the amount of $226,752 noted in Ms. Gallant's October 2008 e-mail or the $227,000 per Mr. Trimbath, SPL's expert.

| | |
|---|---|
| Cash receipts per SPL's own report | $9,028,582 |
| Less: payment received from Gaylord | $   57,834 |
| Total Cash Receipts from McPhee | *$8,970,748* |

| | |
|---|---|
| Total Value of Contract + Change Orders | $9,010,316 |
| Cash Receipts per SPL's report | $8,970,748 |
| Contract Balance | $   *39,568* |

| | |
|---|---|
| Contract Balance | $39,568 |
| Less: Credit OCIP | $25,102 |
| Plus: OCIP Credit related to Tech | $18,371 |

---

[2] "[T]he correct calculation in my opinion is to start with the approved contract value at that point in time, minus all payments received and then to make any adjustments as we did for owner controlled insurance program or other factors that are learned in that closeout process.  That's the normal process we would go through."  ECF No. 121 at 128 (Trial Tr. 128:7-13, Jan. 17, 2013).

[3] ECF No. 118 at 63 (Trial Tr. 63:19, Jan. 16, 2013).

| | |
|---|---|
| Less: Unpaid balance to Tech | $22,560 |
| Amount McPhee Owes SPL | **$10,277** |

Both McPhee's accounting records and SPL's Aging Report reflect McPhee owing SPL approximately $10,000 as the outstanding contract balance.

### b. Whether McPhee Waived its Pay-If-Paid Defense

SPL contends McPhee, by its conduct, waived the pay-if-paid clause of the Subcontract. According to SPL this court's finding that no such waiver occurred is erroneous as a matter of law. In its opposition McPhee notes, under Maryland law, it is well established that waiver is a question of fact to be decided by the fact finder. *See* ECF No. 130 at 6. The court rejects SPL's arguments, and reaffirms the following paragraph from the January 6, 2015 Memorandum Opinion.

> The burden is upon SPL to establish by a preponderance of the evidence that McPhee waived its legal defenses to the claims now asserted by SPL. This is a *question of fact* to be decided by the trier of fact. After a review of all the evidence, the court is not convinced that SPL has established that McPhee has waived its legal defenses to SPL's claims. McPhee denies it had any intention of waiving its legal defenses. When McPhee wanted to alter the Subcontract it do so in writing through change orders. McPhee's conduct, in permitting the presentment and advancement of SPL's claims and conditioning any payment on PTJV paying MTR for SPL's claims, is not inconsistent with its non-waiver position. The court finds SPL's claims are barred by the legal defenses available to McPhee under the Subcontract, Change Orders, SPL Lien Releases, and Payment Application.

ECF No. 125 at 31 (emphasis added).

The court's finding that McPhee did not waive its pay-if-paid defense is based on specific evidence. During his direct examination Michael McPhee, the President of McPhee Electric Ltd., explained why McPhee advanced or forwarded SPL's claims to PTJV.

> Q    Did you ever receive any claims or requests for additional money on behalf of SPL?

A       Yes.

Q       What did you do with them?

A       We forwarded them along to Perini/Tompkins JV.

Q       Why would you do that?

A       Because Perini/Tompkins JV had asked us if we had any potential claims.

ECF No. 118 at 156 (Trial Tr. 156:10-17, Jan. 16, 2013)

Q       And had SPL provided you backup or the supporting documents for all of those claims at that point?

A       They had provided some information but it was not very compelling.

Q       So why did you forward on the claim?

A       Because we had a discussion with Perini and Perini had told us that if we forwarded our claims in a total cost fashion that they would indeed promote them on to Gaylord.  I had had conversations with SPL and SPL had told us that they were – – they had lost money and, therefore, my understanding was that their total costs would indeed back up their claim.  I mean, typically you use formulas and – – formulas and theories to typically bolster the losses that you have.  So, I just thought they were putting the cart before the horse and that we would actually get their damages and their total cost records.

Q       When they told you they had been damaged, did you believe them?

A       Yes.

Q       And is that why you advanced the claim?

A       Yes.

*Id.* at 158-59 (Trial Tr. 158:16 - 159:10, Jan. 16, 2013).

Similarly, Mr. Conroy, the CFO of McPhee, explained why McPhee advanced SPL's claims despite McPhee's defense of pay-if-paid.

Q       Were [lien waivers] important as part of your payment application process?

A       Without these, we would not be paid.

Q       Did you rely on them?

A       Yes.

Q       In what way?

A       They put forward as the language says – – these are very standard in our industry – – that the person giving you this waiver is waiving basically any claims or change orders or open items as of that point in time if not already covered in their payment applications.

Q       Let's go to Plaintiff's Exhibit Number 59.

A       I have it.

Q       And could you tell the Court what this is?

A       This is – – well, first, it's a cover email.  But then behind it would be the partial waiver of lien that we would then file as MTR in our payment application process to PTJV.  So these are used on an upstream basis.

Q       And this particular one is provided on April 14, 2008 and on the last page, it references – – well, tell me what the last page is of this document?

A       The last page is for lack of a better term, we call it just a set of carve-outs.  We routinely when we're doing a project of any type and if we have open items or disputes or change orders or unpaid amounts, we will routinely carve these out on the lien waivers.  So that we're not giving up our rights with respect to those items.  We are giving up our rights with respect to anything we don't talk about.

Q       And so you included in this particular lien waiver the claim of SPL.  Is that correct?

> A       The then current iteration value.  Yes.
>
> Q       Now by including this as a carve-out in your lien release to PTJV, what was your intention as it related to your defenses against SPL?
>
> A       Our intention was to preserve the right while we were looking for information, trying to find out if this was valid, to hold their rights for them.  I never thought the intention would be to waive our rights.  That was not the nature of this.

ECF No. 121 at 136-38 (Trial Tr. 136:13 - 138:2, Jan. 17, 2013).

B.      *Settlement Agreement between MTR and PTJV/Gaylord & the Parol Evidence Rule*

"The Court's failure to bar testimony that none of the settlement monies were to be allocated to SPL constitutes legal error.  The global settlement was a fully integrated document.  As a consequence, the parol evidence rule bars the testimony of Mark Makary of PTJV, Michael McPhee, McPhee's President, and Conroy stating that no monies from the settlement agreement were to be paid to SPL for its claims."  ECF No. 128 at 20 (citations omitted).  Upon further consideration, the court finds it erred in admitting testimony concerning the purported oral understanding, either prior to or contemporaneous to executing the settlement agreement, that not one dollar of the Three Million One Hundred Twelve Thousand Five Hundred Dollars ($3,112,500) paid by PTJV to MTR[4] as full and final settlement of any and all claims in the litigation should be applied to SPL's claims.

---

[4] For the record, MTR had a subcontract with PTJV to perform certain work on the Project, including but not limited to electrical and audio visual systems.  Sub-subcontracts were issued, not by the tri-venture MTR, but by one of the entities of this tri-venture (McPhee) to Sub-subcontractors such as SPL.  Mr. McPhee acknowledged this fact during cross-examination.

> Q       Because in your joint venture or tri-venture, McPhee chose to issue the subcontracts in its own name rather than the name of the tri-venture to the different subcontractors?
>
> A       That was our responsibility, yes.

The December 10, 2009 *Final Settlement and Release Agreement* between MTR on the one hand, and the Owner (Gaylord) and Contractor (PTJV) on the other hand, states in pertinent parts:

>**R2.** On or about January 18, 2006, PTJV entered into a subcontract with MTR whereby MTR agreed to perform the electrical, telecommunications, security and audio visual systems work at the Project on a cost-plus, open-book basis (the "Subcontract").

>**R3.** MTR subcontracted portions of the Subcontract to other entities specifically including Simplex Grinnell, Inc., Tech, Inc. and Signal Perfection, Ltd. (collectively referred to as the "Sub-Subcontractors").

>**R4.** Certain disputes arose among the Parties, including the Sub-Subcontractors.

> \*      \*      \*

---

> \*   \*   \*   \*   \*

> Q McPhee had no contract with Perini/Tompkins Joint Venture, correct?

> A Correct.

> \*   \*   \*   \*   \*

> Q MTR has the contract with Perini/Tompkins, right?

> A Correct.

> Q But McPhee has the contract with the subcontractors, right?

> A That is correct.

> \*   \*   \*   \*   \*

> Q McPhee never had a contract with Gaylord, right?  Yes or no?

> A No.  Right.

> Q And McPhee never had a contract with Perini/Tompkins?

> A Correct.

ECF No. 118 at 167-69 (Trial Tr. 167:25 - 168:1, 3-5, 11-14, 23 - 169:1, Jan. 16, 2013).

**R6.**     The Parties agree that it is in their mutual best interests to amicably settle and resolve any and all claims involved in the Litigation as set forth in this Settlement Agreement and avoid the time and expense of further litigation and trial.

**NOW, THEREFORE**, in consideration of the mutual covenants and promises contained herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

\*                              \*                              \*

**2.     Settlement Amount:**  PTJV shall pay to MTR the sum of Three Million One Hundred Twelve Thousand Five Hundred Dollars ($3,112,500) as full and final settlement of all [sic] any and all claims in the Litigation (the "Settlement Amount").  Payment shall be made in immediately available funds payable to MTR Electrical Contractors, LLC . . . .

\*                              \*                              \*

**8.     Cooperation:** . . . In addition, at no additional cost, PTJV agrees to reasonably cooperate with MTR in any disputes with the Sub-Subcontractors including, but not limited to, providing documents and making available employees or others under its control for interview by MTR, deposition or testimony at trial without need for subpoena or court order.  MTR agrees to fully indemnify, defend and hold harmless Gaylord and PTJV, at MTR's sole expense (including without limitation, attorney's fees, expert fees, and litigation expenses) from any and all claims made by the Sub-Subcontractors arising out of or relating to their [S]ub-Subcontracts or the Project.

\*                              \*                              \*

**10.     Entire Agreement:**  This Settlement Agreement constitutes the entire agreement and understanding between the Parties.  *No other representations, inducements, or agreements between the Parties, oral or otherwise, which are not expressly set forth herein, shall be of any force or effect*.  This Settlement Agreement may not be modified, changed, terminated, or waived, in whole or in part, orally or in any other manner, except through an agreement in writing duly executed by authorized representatives of the Parties.

Pl.'s Ex. 91 (emphasis added).

Under Maryland law, in the absence of fraud, duress or mistake, "parol evidence of conversations or alleged conversations made before or at the time of the integration of the contract into writing must be excluded from evidence. . . ." *Kermisch v. Savings Bank of Baltimore*, 266 Md. 557, 560, 295 A.2d 776, 778 (1972).   McPhee's claim that there was a separate oral agreement or understanding that no settlement monies were allocated for SPL's claims does not qualify as an exception to the parol evidence rule because the settlement agreement specifically recognized SPL as one of the Sub-subcontractors which has a dispute and further the settlement agreement unequivocally and clearly states $3,112,500 settlement amount constitutes full and final settlement of any and all claims in the litigation.   Such an oral agreement or understanding, as proffered by McPhee, is inconsistent with the terms of the settlement agreement.   *See Wolfe v. Wolfe*, 12 Md. App. 581, 585 n.2, 280 A.2d 1, 4 n.2 (1970) ("The long standing rule that parol evidence is inadmissible to vary or contradict the terms of a written instrument is subject to the exception that the existence of a separate oral agreement concerning matters on which a written agreement is silent, and which is not inconsistent with the terms of the written instrument, may be proved by parol evidence if, under the circumstances, it may properly be inferred that the parties did not intend the written instrument to be a complete and final settlement of the whole transaction.").

Having found the parol evidence was improperly admitted, the court hereby **STRIKES** the testimonies of three witnesses as follows:

**Mark K. Makary**:    ECF No. 118 at 21-24 (Trial Tr. 21:24 - 24:8), at 34 (Trial Tr. 34:2-13), at 36-37 (Trial Tr. 36:25 - 37:5), at 37-38 (Trial Tr. 37:19 - 38:18), at 39-40 (Trial Tr. 39:11 - 40:11), at 42 (Trial Tr. 42:2 - 21), at 44-45 (Trial Tr. 44:25 - 45:2, Jan. 16, 2013), as well

as objections related to this testimony [ECF No. 118 at 3-4 (Trial Tr. 3:17 - 4:10), at 52-53 (Trial

Tr. 52:25 - 53:17, Jan. 16, 2013)];

> **Michael E. McPhee**: ECF No. 118 at 163-65 (Trial Tr. 163:22 - 165:13), at 179-80

(Trial Tr. 179:14 - 180:10), at 180-81 (Trial Tr. 180:20 - 181:2, Jan. 16, 2013); and

> **John D. Conroy**:      ECF No. 119 at 23 (Trial Tr. 23:4 - 25, Jan. 18, 2013).[5]

With the exclusion of parol evidence concerning an alleged oral agreement or

understanding between MTR and PTJV that the settlement proceeds from PTJV did not include

any dollars for SPL, the remaining, uncontroverted evidence is as follows:

- When McPhee (via MTR) submitted its release of lien to PTJV, MTR carved out the SPL claims by SPL and its subcontractors.  The pending audio visual claims as of February 2008 totaled $1,398,594.  PTJV understood from MTR's actions that MTR was alerting PTJV of SPL's claims;

- At some point disputes concerning the Project arose between MTR and PTJV.  Some of those disputes involved claims asserted by SPL;

- PTJV had claims against Gaylord.  PTJV filed a lawsuit against Gaylord;

- MTR ultimately filed a lawsuit against PTJV and Gaylord;

- The lawsuit between PTJV and Gaylord subsequently settled.  MTR was now at odds with PTJV;

- Besides advancing SPL's claims, MTR advanced Tech, Inc.'s claims;

- Tech, Inc. had at least two separate "contracts" on the Project: one as a subcontractor to SPL's audio visual subcontract and a separate subcontract directly with MTR/McPhee for electrical work;

- Tech, Inc. is 100% owned by Truland, one of the tri-venture companies constituting MTR, *i.e.,* McPhee, Truland, Richards;

- Phalcon, Ltd. owns, among other entities, McPhee and Richards;

---

[5] Any other testimony not specifically identified *supra* which discusses the purported oral agreement/understanding between MTR (McPhee) and PTJV that the settlement proceeds given by PTJV to MTR do not include any funds for SPL's claims is hereby **stricken**.

- During the lawsuit between PTJV and MTR, PTJV filed a motion for summary judgment based on its belief that SPL was not entitled to money because of contractual defenses;

- Tech, Inc. asserted a claim for additional compensation because of the same compression as asserted by SPL/Nelson White.  Tech, Inc. signed the same lien releases that SPL did, and via a similar motion for summary judgment, PTJV sought to knock out Tech, Inc.'s claims;

- MTR, *i.e.,* McPhee, Truland, Richards, resolved the outstanding Tech Inc. claims after reaching a settlement with PTJV;

- SPL is not owned or controlled by MTR, *i.e.*, McPhee, Truland, Richards;

- The December 10, 2009 settlement agreement between MTR and PTJV did not dictate how the $3.1 million settlement proceeds would be distributed nor did the settlement agreement designate what would happen to the settlement proceeds;

- PTJV distributed the settlement proceeds to MTR in a lump sum; and

- The settlement agreement recognized the existence of claims from three Sub-subcontractors:  SPL, Tech, Inc. and Simplex Grinnell, Inc.

With the exclusion of the improperly admitted parol evidence, and in light of the uncontroverted evidence listed *supra*, the court finds there is **no** evidence that the $3.1 million settlement proceeds from PTJV to MTR excluded SPL's claims.  The court now must decide the amount, if any, SPL should receive from the settlement proceeds.

At the outset the court notes McPhee argues in its opposition, even if the court finds it erred in admitting parol evidence, SPL remains unentitled to any settlement proceeds because the court's judgment was premised primarily on McPhee's contractual defenses.  The court found SPL had waived its claims based on language contained in the (a) Subcontract, (b) SPL Lien Releases, (c) Payment Applications and (d) the four Change Orders.  McPhee's argument would carry more weight had not MTR settled Tech's claims by giving Tech money from the $3.1 million settlement proceeds *despite* Tech signing the same lien releases as SPL and even though the Tech Subcontract with MTR also contained a "pay-if-paid" clause.

28

The court finds SPL is not entitled to any settlement proceeds for its delay damage claim for two reasons.  First, SPL's claim in the amount of $1,398,594 submitted to MTR as of February 2008 was asking for its compression or inefficiency costs, not asking for delay damages.  *See* ECF No. 118 at 163 (Trial Tr. 163:7-10, Jan. 16, 2013).  Second, in the January 6, 2015 Memorandum Opinion the court explained why SPL is not entitled to any delay damages.

> The delay-related damage claim is flawed because it rests upon the assumption that only base contract work was performed by SPL and its subcontractors during the alleged period, an assumption inconsistent with the evidence.  In addition, the Subcontract contains no specific completion date and evidence is lacking that SPL was actually delayed.

ECF No. 125 at 32.  The court reaffirms this finding.

As for SPL's compression or inefficiency damage claim, the court likewise finds SPL is not entitled to any settlement proceeds for these costs.  At the outset, the court is aware that Tech apparently received monies from the settlement proceeds for its compression claim.

> Q      Tech had a claim for additional compensation because of the same compression that SPL and Nelson White did, right, sir?
>
> A      That's correct.

ECF No. 118 at 41 (Trial Tr. 41:1-3, Jan. 16, 2013).

> Q      Isn't it true that you and Mr. Jordan sat down and reached an agreement to pay Tech, which was owned by Truland, $900,000?
>
> A      I did not sit down and talk to John Jordan, no.
>
> *                              *                              *
>
> A      John Conroy and John Jordon were doing the conversation.
>
> Q      And the same defenses raised to SPL by PT JV were raised by PT JV to the claims of Tech, correct?
>
> A      Correct.

*Id.* at 185 (Trial Tr. 185:3-5, 9-12, Jan. 16, 2013).  Although Tech and SPL appear similarly

situated, Mr. Conroy testified about a significant difference.

> Q       So what did you do to evaluate Tech's claims?
>
> A       We had started way before then going through their books
> and records again on a total cost basis, the way that I would first
> look at something like this, to look at how much they had spent,
> how much the job cost reports really showed, how much they had
> been paid, looking at how that looked against their estimates on the
> project.  They gave us all that information.  They had also put
> forward with respect to the Tech, Inc. claim directly at McPhee
> which was a $2.2 million claim.  They had put forward an expert
> report from K2 I think was the name of the company.  That was a
> big thick document.  I went through all of that as well.  We along
> the way received a Navigant report.  That was another piece of
> information that I took into account.  And what I was looking at
> and I was talking to Mike McPhee the whole time.  That's how we
> work on this. I work directly for him.  Talking about what sort of
> valuation we would place on these Tech, Inc. claims and open
> items.  They had some open contract balances as well.  What might
> be fair valuations on that and trying then to enter into settlement
> discussions as we do with many vendors and subs.

ECF No. 121 at 139-40 (Trial Tr. 139:18 - 140:15, Jan. 17, 2013).

Stephen Reighard, author of the Navigant Report, testified briefly about Tech's claims.

> Q       Now let's talk about some of the component parts.  This
> report addresses particularly the Tech claim and the SPL claim.
> What did you do in reviewing the Tech claim?
>
> A       I looked at Technical's job cost report, its estimate, its bid
> and how it made its claim using various productivity standards and
> determined that Tech in fact did lose approximately $2 million.

*Id.* at 8 (Trial Tr. 8:6-13, Jan. 17, 2013).  PTJV, the Contractor, hired Mr. Reighard, an expert in

construction accounting and claims analysis, to audit two prime time and material contracts

including the contract with MTR for electrical work.  PTJV asked Mr. Reighard "to determine

what costs were allowable and unallowable per the contract.  And while performing those audit

analysis on MTR's records, it also included evaluating the claims made by MTR's or, yeah, MTR's subcontractors, which would be McPhee and its subs, which is SPL." *Id.* at 7 (Trial Tr. 7:7-12, Jan. 17, 2013).

Contrary to substantiating Tech's loss claim, Mr. Reighard's review of SPL's records revealed SPL did not actually incur any damages.

> Q       Mr. Reighard, how did you evaluate SPL's claim?
>
> A       I asked for and received their original bid and I compared that to the cost incurred and I looked at the profit that they anticipated when they made the bid and I looked at the profit that they made at the end of the job and determined that there was no significant change in the actual profit earned by SPL.
>
> Q       Well, what was the particular method that you used to evaluate the claim?
>
> A       Well, there's no – – if you're looking for an accounting term, there's really no method, per se.  It's an audit of the cost incurred on the project versus the revenues received.
>
> *                              *                              *
>
> Q       And what did you ultimately conclude as it relates to SPL's claim?
>
> A       That SPL incurred no damages on this contract.

*Id.* at 11-12 (Trial Tr. 11:19 - 12:6, 12-14, Jan. 17, 2013).

Moreover, unlike Tech, SPL did not provide all of the information requested by MTR in support of its claim as Mr. McPhee testified.

> Q       And had SPL provided you backup or the supporting documents for all of those claims at that point?
>
> A       They had provided some information but it was not very compelling.
>
> Q       So why did you forward on the claim?

A      Because we had a discussion with Perini and Perini had told us that if we forwarded our claims in a total cost fashion that they would indeed promote them on to Gaylord. I had had conversations with SPL and SPL had told us that they were – – they had lost money and, therefore, my understanding was that their total costs would indeed back up their claim. I mean, typically you use formulas and – – formulas and theories to typically bolster the losses that you have. So, I just thought they were putting the cart before the horse and that we would actually get their damages and their total cost records.

ECF No. 118 at 158-59 (Trial Tr. 158:16 - 159:5, Jan. 16, 2013).

Q      Now, what happened with regard to the SPL claims in [the MTR versus PTJV] litigation? Specifically, did you talk to anybody at SPL about those claims?

A      I did.

Q      Who?

A      I had a meeting with George Douglas.

Q      What was the purpose of that meeting?

A      Well, it was to advise him that we still needed his total cost records in order to demonstrate what his damages were, and that would be what would be compelling to our argument in terms of getting recovery from Perini/Tompkins JV.

*Id.* at 159-60 (Trial Tr. 159:21 - 160:6, Jan. 16, 2013).

Finally the court hereby reaffirms its finding from the January 6, 2015 Memorandum

Opinion and therefore again denies SPL's inefficiency claim for the following reasons:

SPL purchased NWS's claim for inefficiency. NWS maintained no contemporaneous records of its labor and thus SPL had no basis to evaluate NWS's efficiency. SPL failed to establish that NWS's underlying bid assumptions for labor were appropriate. Use of a spreadsheet containing incorrect data in producing a NWS inefficiency analysis is problematic.

ECF No. 125 at 31-32.

C.      *Payment Application No. 20-3*

Although SPL is not entitled to any settlement proceeds for its delay claim and inefficiency claim, the court finds SPL is entitled to $140,329 per Payment Application No. 20-3. The issue of $140,329 under Payment Application No. 20-3 was discussed periodically during the five day bench trial.

George Douglas, SPL's Vice President of Sales, laid the foundation about the history of Payment Application No. 20-3.

> Q      And what does this basically say?
>
> A      That basically states that Ron [Stawecki of MTR] had sent Matt [DeWitt of SPL] an e-mail saying go ahead and send the pay app over for this, this has been approved.
>
> Q      And how much was that change order amount?
>
> A      That was $140,000 that was associated – – the labor component of the $240,000 materials only change order.
>
> *                              *                              *
>
> Q      Were you paid for the materials previously under change order 4?
>
> A      Yes.
>
> Q      And this was to pay you for the labor?
>
> A      That's correct.

ECF No. 116 at 120 (Trial Tr. 120:1-8, 21-25, Jan. 14, 2013).  Frederick Curdts, Senior Vice President of SPL, testified that Payment Application No. 20-3, in the amount of $140,329, has not been paid.  *See* ECF No. 117 at 170 (Trial Tr. 170:24-25, Jan. 15, 2013).  Mr. Curdts corroborated Mr. Douglas' testimony, namely, SPL was instructed to bill $140,329 for labor

performed for the change orders.  *Id.* at 205 (Trial Tr. 205:18-21, Jan. 16, 2013).  Mr. Conroy, McPhee's CFO, testified more fully about Payment Application No. 20-3.

> Q     Now there's also a billing application for $140,329 payment application 20.3.  What happened with that payment application?
>
> A     That payment application was also very late in the project. It may have been August or September of 2008.  Again an email from the owner to the PTJV, the general contractor, then to us, saying it was okay to bill these amounts.  So this particular payment application is as I recall it is for labor, various labor of SPL and its subcontractors incurred on various change order work that must have occurred throughout the spring of 2008.  But again, it was something that we are told by the owner through PTJV to allow billing for.
>
> *                          *                          *
>
> Q     And did McPhee or MTR ever receive a change order associated with that $140,000?
>
> A     Did McPhee?
>
> Q     Yes.
>
> A     McPhee would not receive change orders.  That wasn't the way our contract worked with PTJV.
>
> Q     Did you ever get paid for it?
>
> A     No.
>
> Q     Did you ever issue a change order to SPL for it?
>
> A     No.

ECF No. 121 at 129-30, 131 (Trial  Tr. 129:15 - 130:2, 131:1-10, Jan. 17, 2013).  On cross-examination Mr. Conroy provided additional information about this payment application.

> Q     Now, the 140,329 was submitted in MTR's billing to PT JV, was it not, sir?

> A       At a time when we hadn't been paid for six months at that
> point, yes.
>
> Q       And the 140,329 was included in the lawsuit, wasn't it, sir,
> the lawsuit between MTR and PT JV?
>
> A       Yes.

ECF No. 119 at 21 (Trial Tr. 21:9-15, Jan. 18, 2013).   The court finds SPL is entitled to

$140,329 that had been approved by Gaylord and PTJV for labor associated with the change

orders.   This amount should have been paid to SPL from the $3.1 million settlement proceeds.

*D.       Payment Application No. 20-2*

Through Mr. Douglas and Mr. Curdts, SPL presented evidence indicating McPhee paid

one-half of the retainage, but McPhee owes SPL $111,526 for the remaining one-half.  *See* ECF

No. 116 at 140 (Trial Tr. 140:11-16), at 144 (Trial Tr. 144:13-23, Jan. 14, 2013); ECF No. 117 at

170 (Trial Tr. 170:21-23, Jan. 15, 2013).   Mr. Douglas testified Mr. Stawecki of MTR directed

him to bill for the unpaid one-half retainage.

Mr. Trimbath, SPL's expert in the area of quantitative and methodology of damages

concerning construction activities, opined $111,526 is due for one-half outstanding retainage

based upon the outstanding invoices submitted by SPL to McPhee.   As noted *supra* the court

finds Mr. Trimbath's methodology for determining the outstanding contract balance

unpersuasive.   McPhee's counsel highlighted the problem with Mr. Trimbath's methodology on

cross-examination of Mr. Trimbath.

> Q       Did you do any independent analysis to confirm that that
> was a valid payment application and that it was due and owing?
>
> A       I accepted that it was on the accounting records of SPL,
> that it had been submitted for payment and payment had been
> made on half of it, of the 111,526 for the retention.   So, I did
> determine it was valid based upon payment being made on part of
> it.

Q      Beyond the fact that McPhee – – beyond the fact that SPL recorded a payment against this invoice for a portion, did you make any other evaluation as to whether or not the amounts requested were due and owing?

A      No, I did not.

Q      And if in fact the amounts requested are not due and owing, they would not be a proper contract balance, correct?

A      If they were not due and owing and there was proof that they were not due and owing, I would agree.

\*                                    \*                                    \*

Q      Now, you don't know how much money SPL has been paid on this contract, do you?

A      Do not know in total, no.

Q      You've not attempted to calculate that?

A      I have attempted to calculate it.

Q      And you cannot do that by SPL's records?

A      I could not.  I was not successful in determining that dollar amount.

ECF No. 118 at 103-04, 105 (Trial Tr. 103:16 - 104:6, 105:11-18, Jan. 16, 2013).  The court finds the methodology utilized by Mr. Conroy to determine the contract more reliable than Mr. Trimbath's methodology.  Mr. Conroy's methodology revealed a contract balance of $10,613. The court thus rejects SPL's assertion that McPhee owes it $111,526 as the remaining one-half retainage for Payment Application No. 20-2.

E.      *Affidavit of Frederick Curdts*

At trial Mr. Curdts testified that he believed SPL had been paid approximately $8.8 million by McPhee.  During cross-examination McPhee's counsel noted Mr. Curdts' deposition

testimony where Mr. Curdts stated SPL had been paid $8,970,748.17.  Mr. Curdts explained, "I

believe I was incorrect at the time.  I think that I added a number in that was for an invoice but

the invoice hadn't been paid."  ECF No. 117 at 189 (Trial Tr. 189:14-16, Jan. 15, 2013).  In light

of this response McPhee's counsel probed further.

> Q      How much have you been paid to date?
>
> A      I don't know exactly, but I believe it's close to about 8.8
> million.
>
> Q      Eight point – –
>
> A      8,800,000
>
> Q      You believe you have been paid 8.8 million?
>
> A      Yes.
>
> Q      And so, you think that the testimony you gave in 2009 with
> the records in front of you was incorrect?
>
> A      I believe it was incorrect.
>
> Q      And you've got no documents – – none of these accounting
> records that you have here with you show what you've been paid
> on the contract?
>
> A      I can't say that with all this paperwork that it's not in here
> somewhere, but I couldn't tell you where it is.

*Id.* at 189-90 (Trial Tr. 189:17 - 190:6, Jan. 15, 2013).

After this court issued its January 6, 2015 Memorandum Opinion, Mr. Curdts reviewed

the opinion and re-reviewed Plaintiff's Exhibit 82, SPL's Aging Detail by Job Cost Report as

well as Mr. Conroy's testimony regarding this exhibit.  In his February 2, 2015 Affidavit Mr.

Curdts explains:

> In reviewing the Aging Cost Report, I identified two (2)
> entries that were erroneously included and therefore should not

have been considered by anyone using this document to calculate the payment amounts SPL received from McPhee.

Specifically, I identified two (2) entries approximately halfway down the first page of the Aging Cost Report, each totaling $36,445.84, that should have not been included on the Report.

I determined that they should not have been included on the report, because the first two entries follow the pattern of other entries on the report, where an "Invoice" amount is stated and then immediately followed by a "Cash receipt" amount (or amounts) that total the invoice amount. The only difference is that the "Cash receipt" amounts are followed by a minus sign ("-") to reflect that it is a deduction offsetting the invoice amount.

The second two entries follow the exact opposite pattern of all other entries on the Aging Cost Report: the "Invoice" amount is followed by a minus sign ("-"), while the "Cash receipt" amount is not. This reflects an intentional determination that the prior "Invoice" and "Cash receipt" amounts were mistakenly shown and effectively deleted them by netting both of them out to a "$0" amount.

Consequently, none of these two entries for $36,445.84 should be considered by anyone using the Aging Cost Report to determine the amount of money that McPhee paid to SPL on the project.

I then recreated a spreadsheet to track all amounts on the Aging Cost Report that SPL had actually been paid, including entries for small adjustments, which Conroy excluded when testifying about how the contract balance should be calculated. . . .

When the positive $36,445.84 entries are entirely excluded, but including the entries for small adjustments, which SPL believes that Conroy wrongly excluded, the actual total that SPL was paid by McPhee is $8,897,856.49.

ECF No. 128-14 at 2-3 (Curdts Aff. ¶¶ 6-12). The court has reviewed Plaintiff's Exhibit 82 and

has confirmed the two sets of plus/minus and minus/plus entries of $36,445.84.

McPhee moves to strike Mr. Curdts' affidavit on the grounds that it is hearsay and not

evidence in the case, and that the appropriate time to raise this issue was in rebuttal, not 108

weeks after the trial ended.  In its opposition SPL argues Mr. Curdts' affidavit is admissible under Rule 52(b) which allows a court to amend or alter its findings of fact.  "The Court should remedy this oversight, equally committed by everyone reviewing the evidence, by amending its findings of fact and determining that McPhee's payments to SPL are $72,891.68 less than Conroy testified."  ECF No. 132 at 5.  In its reply McPhee asks the court to disregard Mr. Curdts' affidavit.  "SPL's failure to comprehend its own Aging Detail is not of McPhee's making:  it did not stem from any surprise at trial and there is nothing manifestly unfair about requiring a party to understand its own evidence and legal theory of the case."  ECF No. 134 at 1-2.

Having reviewed Mr. Curdts' affidavit, his trial testimony, Mr. Conroy's trial testimony and Plaintiff's Exhibit 82, the court hereby **denies** McPhee's motion to strike Mr. Curdts' affidavit, an exhibit to SPL's motion for new trial.

SPL however is not entitled to a credit of $72,892 to the contract balance.  The court has painstakingly outlined *supra* that there is a difference of $336 between what McPhee's accounting records show it paid SPL and what SPL's Aging Report lists as payments from McPhee.  SPL's Aging Report has the higher dollar value.  If Mr. Conroy had overlooked the four entries of $36,445.84 on the *first* page of SPL's Aging Report, the difference between McPhee's accounting records and SPL's Aging Report would be much higher.  The court finds Mr. Conroy did not overlook these four entries which has a total value of zero dollars.  Because Mr. Conroy did not improperly include these entries, no adjustment to the contract balance is warranted.

Mr. Curdts' affidavit also challenges Mr. Conroy's exclusion of small amounts he could not identify.

Q       All right.   What's the other adjustment if any that you would make?

A       The other adjustment is in the SPL cash receipts records, again on this A.R., aging report, there's a number of little minor adjustments that I'm not sure what those are.   There's $51.75[6]. There's $137.25.  I don't know what those are.  But they don't tie to anything on McPhee's books.  We can look at the payments that came from McPhee and those we can tie out.

ECF No. 121 at 122 (Trial Tr. 122:13-21, Jan. 17, 2013).

The court declines to adjust the contract balance based on these two entries.  Mr. Curdts does not explain what these two transactions concern.  Moreover, these two transactions are listed on SPL's Aging Report as "cash receipts" since each entry is followed by a minus sign ("-"). *See* Pl.'s Ex. 82 at 1, 2.  Neither entry is preceded by an *invoice* of the same value, *i.e.*, $51.75 does not precede $51.75- and $137.25 does not precede $137.25-.  Once again, the court notes there is a difference of $336 between what McPhee's accounting records show it paid SPL and what SPL's Aging Report lists as payments from McPhee.  SPL's Aging Report has the higher dollar value.  These two entries totaling $189 would reduce the difference between McPhee's accounting records and SPL's Aging Report to $147.  Finally, the court notes Mr. Conroy relied upon *McPhee's records* in identifying the amounts paid to SPL and in determining the amount of the contract balance McPhee owes to SPL.  In conclusion, the court makes no adjustments to the amount of the contract balance McPhee owes to SPL.  Mr. Curdts' affidavit does not persuade the court that any adjustments are warranted.

F.      *Amending the Judgment*

The court hereby **amends** the judgment as follows:

McPhee owes SPL $140,329 under Payment Application No. 20-3, an amount included in the settlement proceeds from PTJV to MTR.

---

[6] This amount is actually **$51.76** on SPL's Aging Report.  *See* Pl.'s Ex. 82 at 1.

The court adjusts the amount of the contract balance McPhee owes SPL from $10,624 (per the January 6, 2015 Memorandum Opinion and Order) to $10,613.

The total amount McPhee owes to SPL is $150,942.  An amended judgment in this amount along with Maryland's statutory prejudgment simple interest of six percent (6%) per annum will be entered in favor of SPL against McPhee.  The court will grant six (6) years of prejudgment interest at $9,056.52 per year for a total prejudgment interest calculation of $54,339.12.  The total judgment will be **$205,281.12**.

## CONCLUSION

For the reasons stated above, the court will grant in part and deny in part SPL's alternative motion to amend or alter judgment.  SPL's motion for new trial will be denied.  McPhee's motion to strike the affidavit of Frederick Curdts will be denied.  An Order will be entered separately.


  August 31, 2015_____              _____/s/_____
          Date                              WILLIAM CONNELLY
                                    UNITED STATES MAGISTRATE JUDGE